UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-21868-CIV-GAYLES

MOVIMIENTO DEMOCRACIA, INC.;
LIBAN CONCEPCION LIO;
ALEXIS LEYVA; MICHAEL PEREZ PEREZ;
YORDANKI PEREZ VAREA;
ALEXANDER VERGARA LOPEZ;
JEGNIER CESPEDES ALMAGUER, et al.,

       Plaintiffs,

vs.

JEH JOHNSON, Secretary,
Department of Homeland Security, et al.,

       Defendants.
_____/

DEFENDANTS' RESPONSE AND OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendants, by and through their undersigned counsel, file their Response and Opposition to Plaintiffs' Motion for Preliminary Injunction, and state:

I.    FACTUAL BACKGROUND

Plaintiffs Liban Conception Lio; Alexis Leyva; Michael Perez Perez; Yordank Perez Varea; Alexander Vergara Lopez; and Jegnier Cespedes Almaguer, are natives and citizens of Cuba.[1] On May 21, 2016, they were part of a group of Cuban citizens traveling by boat, in an attempt to enter the United States. They were encountered by a Coast Guard cutter near the American Shoal Lighthouse, which is approximately 6.5 nautical miles from dry land, off Sugarloaf Key, Florida.

---

[1] Defendants will refer to these individuals as the "Migrant Plaintiffs." Additional named plaintiffs include Movimiento Democracia, and two alleged family members, Carlos Leyva and Jose Alberto Concepcion, who reside in Miami-Dade County, Florida. Complaint, ¶ 20. Defendants submit that Movimiento Democracia, Carlos Leyva, and Jose Alberto Concepcion lack standing to assert the purported rights of third parties.

1

The Cuban migrants jumped from their vessel into the water, and nineteen swam to the lighthouse. The remaining two migrants embarked a Coast Guard small boat. Throughout the day, the Coast Guard attempted to convince the migrants to come aboard the cutter, since the lighthouse had been abandoned in 2015 for being structurally unsound and unsafe. In the late afternoon, the Cuban migrants agreed to come onboard the cutter.

The six Migrant plaintiffs, as well as the other Cuban migrants, have been interviewed by Asylum Pre-Screening Officers from the United States Citizenship and Immigration Services (USCIS), to determine if any credible fears of persecution if returned to their native country of Cuba. USCIS reported no protection concerns for the Cuban migrants. Migrant plaintiffs and the other migrants have been designated for repatriation to Cuba, pursuant to normal processes used for Cuban migrants who have not reached dry land in the United States.

The American Shoal Lighthouse was built in the late 1800's, and served as an aid to navigation. The lighthouse is supported by nine (9) pilings driven into the coral reef below. The land on which the lighthouse sits is completely submerged at all times. There is no dry land on which the lighthouse sits.

II.     PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION SHOULD BE DENIED

Plaintiffs seek a preliminary injunction to prevent the Coast Guard from repatriating them to Cuba. "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." Suntrust Bank v. Houghton Mifflin Company, 268 F.3d 1257, 1265 (11th Cir. 2001)(citation omitted).

Any motion or suit for either a preliminary or permanent injunction must be based upon a cause of action, such as a constitutional violation, a trespass, or a nuisance. Alabama v. United States Army Corps of Engineers, 424 F.3d 1117, 1127 (11th Cir. 2005). "There is no such thing

as a suit for a traditional injunction in the abstract.  For a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would withstand scrutiny under Fed.R.Civ.P. 12(b)(6)(failure to state a claim)."  Id. citing Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004).   An injunction is a "remedy potentially available only after a plaintiff can make a showing that some independent legal right is being infringed – if the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise."  376 F.3d at 1098.

In order to obtain a stay of their repatriation, Migrant plaintiffs would have to demonstrate that some legal right of theirs would be violated by their repatriation.

> A. Migrant Plaintiffs Have Failed to Establish a Likelihood of Success on the Merits of a Claim that the Coast Guard's Decision was Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance With Law

In order to obtain a preliminary injunction, the Migrant plaintiffs must demonstrate:  (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.  Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003).   "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites."  Zardui-Quintana v. Richard, 768 F.2d 1213, 1216 (11th Cir. 1985)(citations omitted).

In reaching its decision that Migrant plaintiffs did not reach dry land for the purposes of the Immigration and Nationality Act (INA), and therefore are not applicants for admission under 8 U.S.C. § 1225(a)(1), the Coast Guard engaged in informal agency adjudication.  Judicial

3

review of such adjudication occurs under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 – 706.  In Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985), the Supreme Court recognized that, "a formal hearing before the agency is in no way necessary to the compilation of an agency record."  Further, "[t]he APA specifically contemplates judicial review on the basis of the agency record compiled in the course of informal agency action in which a hearing has not occurred."  Id., citing 5 U.S.C. §§ 551(13), 704, 706.

The standard of review under the APA is "exceedingly deferential."  Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008).  A court "may only set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Citizens for Smart Growth v. Secretary, Dept. of Transportation, 669 F.3d 1203, 1210 (11th Cir. 2012), citing 5 U.S.C. § 706(2)(A).   The Eleventh Circuit elaborated:

> To determine whether an agency decision was arbitrary and capricious, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.  This inquiry must be searching and careful, but the ultimate standard of review is a narrow one.  Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the *least* latitude in finding grounds for reversal; administrative decisions should be set aside in this context only for substantial procedural or substantive reasons as mandated by statute, not simply because the court is unhappy with the result reached.

669 F.3d at 1210 (emphasis in original), citing Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541-42 (11th Cir. 1996)(quotation marks and ellipses omitted).

Migrant Plaintiffs cannot demonstrate a substantial likelihood of success on the merits of their APA claim, because the Coast Guard's decision was neither arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[2]

---

[2] In support of their claim, plaintiffs cite to Movimiento Democracia v. Chertoff, Case No. 06-20044-CIV (S.D.Fla.).  Complaint, ¶ 14.  This decision was vacated by the district court on March 17, 2006 (Exhibit A), pursuant to a

### III. THE MIGRANT PLAINTIFFS WERE NOT APPLICANTS FOR ADMISSION UNDER SECTION 235(a)(1) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C. § 1225(a)(1)

Migrant Plaintiffs allege that, by being on American Shoal Lighthouse, they had reached land territory of the United States, sufficient to render them applicants for admission under section 235(a)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(a)(1). That provision provides as follows:

> (a) Inspection
>
> > (1) Aliens treated as applicants for admission
> >
> > An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

The text of § 1225(a)(1) thus provides two ways in which an alien can be deemed an applicant for admission: (1) presence in the United States without being admitted, or (2) arrival in the United States, whether or not at a designated port of arrival and including an alien who is interdicted in international or United States waters and is brought to the United States.

The second category is referred to as an "arriving alien," and is defined at 8 C.F.R. § 1001.1(q):

> The term arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport....

---

Stipulation of Settlement and Dismissal and Joint Motion to Vacate Order Denying Defendants' Motion for Summary Judgment (Exhibit B). Moreover, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." Camreta v. Greene, 563 U.S. 692, 709 n.7 (2011)(citation omitted).

Under this definition, the Migrant plaintiffs would not be arriving aliens because they were not coming or attempting to come into the United States at a port of entry, nor were they seeking transit through the United States at a port-of-entry. Finally, the Migrant plaintiffs were not interdicted and brought into the United States. Consequently, if they are to be deemed applicants for admission, it can only be through their presence in the United States, without being admitted.

> IV. THE MIGRANT PLAINTIFFS' PHYSICAL PRESENCE IN UNITED STATES TERRITORIAL WATERS DOES NOT CONSTITUTE PRESENCE IN THE UNITED STATES UNDER 8 U.S.C. § 1225(a)(1)

The American Shoal Lighthouse is approximately 6.5 nautical miles from shore within the twelve (12) nautical mile territorial sea of the United States. However, it is well-established that mere physical presence in United States territorial waters does not constitute being "present in the United States" for purposes of § 1225(a)(1). Indeed, two courts in the Southern District of Florida have rejected claims that an alien's entry into the territorial waters of the United States constitutes entry into the United States for purposes of immigration. In Rodriguez v. Ridge, 310 F.Supp.2d 1242, 1245 (S.D.Fla. 2004), this Court observed that "[a] fair reading of Section 235(a)(1) of the INA reveals that Congress could not have intended that mere entry into United States waters is sufficient to accord the status of "applicant for admission." In Abreu v. Albright, Case No. 99-2156-CIV-HOEVELER (S.D.Fla.), another district court similarly concluded that crossing into the territorial waters of the United States is insufficient to constitute physical presence in the United States for purposes of the INA.

In defining who shall be considered an applicant for admission, Congress identified two categories of aliens, and used the disjunctive "or" to separate the two categories. As "a general rule, the use of a disjunctive in a statute indicates alternatives and requires that those alternatives

6

be treated separately. Hence, language in a clause following a disjunctive is considered inapplicable to the subject matter of the preceding clause." <u>Brown v. Budget Rent-A-Car Systems, Inc.</u>, 119 F.3d 922, 924 (11th Cir. 1997), <u>citing</u> <u>Quindlen v. Prudential Ins. Co. of America</u>, 482 F.2d 876, 878 (5th Cir. 1973). "Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings," and a statute written in the disjunctive is generally construed as "setting out separate and distinct alternatives." <u>In Re Espy</u>, 80 F.3d 501, 505 (D.C. Cir. 1996), <u>citing</u> <u>Reiter v. Sonotone Corporation</u>, 442 U.S. 330, 339 (1979), and <u>United States v. Behnezhad</u>, 907 F.2d 896, 898 (9th Cir. 1990).

An alien shall be treated as an applicant for admission if he or she is present in the United States who has not been admitted, or arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters). 8 U.S.C. § 1225(a)(1). Applying the general rule of statutory construction, since Congress used the disjunctive "or," aliens covered by the second clause in § 1225(a)(1), those who arrive in the United States, are to be treated as separate and distinct from the first clause, aliens who are present in the United States who have not been admitted. Thus, an alien who is interdicted in international or United States waters, and is not brought to the United States, is not an applicant for admission under § 1225(a)(1). More importantly, because "language in a clause following a disjunctive is considered inapplicable to the subject matter of the preceding clause," <u>Brown</u>, 119 F.3d at 924, an alien who falls within the second clause cannot also fall within the first clause. Thus, an alien who is interdicted in U.S. waters is not "an alien present in the United States who has not been admitted." Instead, such alien is covered by the second clause of § 1225(a)(1).

The text of § 1225(a)(1) does not suggest any basis for deviating from the general rule

7

that the two clauses should be treated as separate and distinct alternatives.   Congress drew a distinction between aliens who are present in the United States who have not been admitted, and those who arrive in the United States.   In particular, Congress provided for instances where aliens are interdicted in international or United States waters, and intended such aliens to be applicants for admission only if they were brought to the United States.  Plainly, if an alien was interdicted in United States waters, and not brought to the United States, it would be contrary to Congress' intent to deem such an alien an applicant for admission because they were merely present in United States waters.

The correctness of this conclusion is also supported by the definition of the term "United States" in immigration law.  Section 101 of the INA provides:

> The term "United States," except as otherwise specifically herein provided, when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States.

8 U.S.C. § 1101(a)(38).  The Court of Appeals for the Third Circuit concluded that this definition was significant particularly where a former definition included United States waters.  Yang v. Maugans, 68 F.3d 1540, 1548 (3d Cir. 1995).

> Significantly, the current version does not include waters or airspace subject to the jurisdiction of the United States.  Nor can it be said that the current definition implicitly includes territorial waters.

Id.  The Court noted that the United States Code has several definitions of the term "United States" depending on the context.  Id.; see e.g., 15 U.S.C. § 2052(a)(14); 26 U.S.C. § 3306(j)(2); 33 U.S.C. § 902(9); 18 U.S.C. § 5.

> Given the multitude of definitions Congress provided for "United States" in different contexts, we think it behooves a court to adhere strictly to the statutory definition applicable to the situation at bar. We therefore conclude that under the Immigration and Nationality

8

Act of 1952, merely crossing into the territorial waters of the United States is insufficient to constitute physical presence for the purpose of determining whether an alien has entered the United States.

Yang, 68 F.3d at 1549.[3]

Yang involved a group of Chinese nationals aboard the ship "Golden Venture" who, after the ship struck a sandbar, swam ashore and were detained by law enforcement officers. Id. at 1544. Among other allegations, they claimed that they entered the United States by sailing into United States waters and were thus entitled to deportation proceedings and not exclusion proceedings. Id. at 1543, 1546. Prior to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (Sep. 30, 1996)("IIRIRA"), an alien would be placed in either deportation or exclusion proceedings depending upon whether he or she made an entry into the United States. See Leng May Ma v. Barber, 357 U.S. 185, 187 (1958). In agreeing with the government that Yang had not made an entry, the Court rejected the claim that presence in United States waters constituted an entry. Yang, 68 F.3d at 1549. Other courts of appeal to consider that issue have reached the same conclusion, that United States waters are not covered by the Immigration and Nationality Act and that an alien must make it to dry land. Zhang v. Slattery, 55 F.3d 732, 754 (2d Cir. 1995); Chen Zhou Chai v. Carroll, 48 F.3d 1331, 1343 (4th Cir. 1995).

United States immigration law is designed to regulate the travel of human beings, whose habitat is land, not the comings and goings

---

[3] In 8 U.S.C. § 1185, Congress granted the President the authority to control the travel of citizens and aliens from and to the United States. In 8 U.S.C. § 1185(c), Congress provided that "The term 'United States' as used in this section includes the Canal Zone, and all territory and waters, continental and insular, subject to the jurisdiction of the United States." (emphasis supplied). Congress's use of a broader definition of "United States," which includes territory and waters subject to the jurisdiction of the United States, for purposes of § 1185, is compelling evidence that the definition of "United States," for other sections of the INA, did not include territorial waters.

>of fish or birds.  We hold that an alien attempting to enter the
>United States by sea has not satisfied the physical presence
>element . . . at least until he has landed.  Zhang, therefore, was not
>physically present until he came to the beach.

Zhang, 55 F.3d at 754.

While IIRIRA has eliminated the deportation and exclusion proceedings and replaced them with removal proceedings, those decisions support the Attorney General's present construction of the INA.  For if presence in United States waters did not amount to an entry and require deportation proceedings, then it follows that mere presence in United States waters will not require a removal proceeding and the right to apply for asylum and withholding of deportation.  Those benefits attach only if an alien is brought from United States waters to dry land.  Accordingly, persons interdicted in United States waters need not be treated differently from persons interdicted on the high seas.

In the instant case, the Migrant plaintiffs were physically present on an abandoned lighthouse, located in U.S. territorial waters.   Since mere physical presence in territorial waters is insufficient to render them applicants for admission, any claim they have must be based upon their presence on the American Shoal Lighthouse.

>V.     THE MIGRANT PLAINTIFFS' PHYSICAL PRESENCE ON THE AMERICAN SHOAL LIGHTHOUSE DOES NOT CONSTITUTE BEING "PRESENT IN THE UNITED STATES" FOR PURPOSES OF THE INA

>A.     The Agency's Decision

In making its decision, the Coast Guard examined the characteristics of the American Shoal Lighthouse.  Exhibit C, Declaration of Captain James D. Carlson.  It is a nine-legged iron and wrought iron structure, with a tower height of 109 feet.  Carlson Decl., ¶ 5; Exhibit D (Photographs of American Shoal Light).  The Light is located within the territorial sea of the United States, approximately 6.5 nautical miles south of Sugarloaf Key, Florida.  Further, the

Light is outside the boundaries of the fifty states and various territories of the United States.  Id.

The Light was installed in 1880, and has been in continuous service until 2015, when an automatic light was installed nearby.  Id., ¶ 6.  The Light is now abandoned and no longer in use.

The Light is not connected to United States' dry land.  Id., ¶ 7.  The anchors in the Light's supporting structure were drilled into coral reef on the seabed in the territorial seas of the United States and submerged at all times.  At its most shallow depth, the water beneath the Light is approximately four feet.

The Coast Guard then analyzed INA § 235(a), 8 U.S.C. § 1225(a), to determine whether the Migrant plaintiffs were applicants for admission to the United States, by virtue of being on the Light.  The agency relied upon the 1996 opinion from the Department of Justice's Office of Legal Counsel (OLC), dealing with the Rights of Aliens Found in U.S. Internal Waters, 20 U.S. Op. Off. Legal Counsel 381, 1996 WL 33101205 (1996)(attached as Exhibit E), Carlson Decl., ¶ 9.  That opinion concluded that undocumented aliens seeking to reach the United States, aboard a transit vessel that has reached the internal waters of the United States at the time of interdiction, but who have not landed or been taken ashore on United States dry land, are not entitled removal proceedings or other proceedings under the INA.[4]

The Coast Guard did not view American Shoal Light, an abandoned aid to navigation, as United States dry land.  Carlson Decl., ¶ 11.  Coast Guard policy, which implements the 1996 OLC interpretation, is that migrants interdicted in United States internal waters, United States territorial seas, or onboard vessels moored to a United States pier, are not considered to have landed ashore and may be directly repatriated.  Id., ¶ 10.  Further, migrants located on pilings, low-tide elevations, or aids to navigation are not considered to have entered the United States.  In

---

[4] In this case, the Migrant Plaintiffs did not reach internal waters of the United States, as American Shoal Light is approximately 6.5 nautical miles from the shores of the United States.

contrast, undocumented aliens who are on U.S. land, bridges, or piers are considered to have landed ashore, even if they subsequently re-enter the water.

Because American Shoal Light does not constitute United States dry land, the individuals removed from the Light were not considered to have entered the United States. Id., ¶ 11.

B.      Pre-IIRIRA Concepts of "Entry" and "Landing"

The issue in this case is whether the plaintiffs' physical presence on the American Shoal Lighthouse constituted being "present in the United States" under 8 U.S.C. § 1225(a)(1). The Coast Guard determined that it was not. When it enacted IIRIRA, Congress did not provide a definition for what constituted "presence" in the United States. Thus, the intent of Congress in enacting § 1225 is best determined by reference to the provisions in the INA pertaining to an alien's presence in the United States, and the administrative and judicial interpretations of such provisions, prior to the enactment of IIRIRA. Review of these provisions and their interpretations will establish that the Coast Guard's conclusion was reasonably and rationally related to the facts and the interpretation of the INA.

Prior to the enactment of IIRIRA, the procedure by which an alien was removed from the United States turned on the physical location of the alien. Assa'ad v. United States Attorney General, 332 F.3d 1321, 1326 (11th Cir. 2003). "Excludable aliens are those who seek admission but have not been granted entry into the United States. Even if physically present in this country, they are legally considered as detained at the border. Deportable aliens, on the other hand, have succeeded in gaining entry into the United States, whether legally or illegally." Fernandez-Roque v. Smith, 734 F.2d 576, 578 n.2 (11th Cir. 1984). Aliens who had not made an entry were placed in exclusion proceedings, while those who had were placed in deportation proceedings. Landon v. Plasencia, 459 U.S. 21, 25-26 (1982).

Under the INA § 101(a)(13), 8 U.S.C. § 1101(a)(13)(1994), "entry" was defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise ... ."  The Board of Immigration Appeals (BIA), in Matter of Pierre, 14 I & N Dec. 467 (BIA 1973), formulated a more precise test as to what constitutes entry into the United States:

> An entry involves: (1) a crossing into the territorial limits of the United States, i.e. physical presence; (2)(a) an inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

As to the concept of "physical presence," the Second Circuit in Correa v. Thornburgh, 901 F.2d 1166 (2nd Cir. 1990), held that an alien who arrived by airplane from Guatemala, to Houston, Texas, was "physically present" when she disembarked her flight in Houston. Id. at 1171-72.  Thus, physical presence did not occur when the aircraft crossed into United States airspace, or touched the ground in Houston.  Applying Correa and Matter of Pierre, the Second Circuit in Zhang held that "an alien attempting to enter the United States by sea has not satisfied the physical presence element of Pierre at least until he has landed." 55 F.3d at 754.  The Court further found that Zhang was not physically present until he came to the beach. Id.  Thus, under the concept of "entry" in the old INA, physical presence in the territorial limits of the United States did not occur until an alien disembarked from an aircraft, in the case of arrivals by airplane.  Applying this principle, an alien arriving by sea onboard a vessel would not be physically present, within the territorial limits of the U.S., until he or she disembarked from the vessel and reached shore.  Zhang, supra.

In the case of aliens who come to the United States by land by means of an international bridge, the BIA has held that such an alien does not "land" in the United States until he touches

13

United States soil.  Matter of Lewiston-Queenston Bridge, 17 I & N Dec. 410 (BIA 1980), 1980 WL 121906 (BIA).    In that case, the Niagara Falls Bridge Commission, which operated the international bridge linking Queenston, Ontario, and Lewiston, New York, had been fined by the INS under INA § 271(a), 8 U.S.C. § 1321(a), for its purported failure to prevent an unauthorized entry of an alien.[5]   The alien had crossed the bridge by automobile from Canada, and presented himself for inspection to a U.S. Immigration Officer at the primary inspection booth.  Id. at 411.  The alien was referred to secondary inspection and ultimately denied admission.  After being given a Notice of Refusal of Admission, the alien was directed to return to Canada.  Instead of complying, the alien made a U-turn so he was facing away from Canada, rolled up his car's window, tore up the Notice given him by the immigration inspectors as they watched, and without ever leaving the United States "entered" the United States.  Id.

The INS levied a $1,000 fine upon the Bridge Commission, alleging that it failed to prevent the unauthorized entry of the alien into the U.S., and allowed him to land "at a time or place other than as designated by the immigration officers."  The Bridge Commission challenged the fine, maintaining that once the alien touched United States soil at the port of entry in Lewiston, and reported for inspection at an authorized time and place, the alien had "landed" in compliance with the requirements in 8 U.S.C. § 1321(a).   The INS argued that the term

---

[5]  8 U.S.C. § 1321(a)(1970) provided, in relevant part:

> It shall be the duty of every person, including the owners, masters, officers, and agents of vessels, aircraft, transportation lines, or international bridges or toll roads, other than transportation lines which may enter into a contract as provided in section 1228 of this title, bringing an alien to, or providing a means for an alien to come to, the United States (including an alien crewman whose case is not covered by section 1284(a) of this title) to prevent the landing of such alien in the United States at a port of entry other than as designated by the Attorney General or at any time or place other than as designated by the immigration officers.

"landing" should be equated with "entry," and that if any alien entered the United States without inspection, after gaining access to the United States over an international bridge, liability would result to the bridge owner. Id.

The BIA rejected the INS's position, finding that the term "landing" was a broader concept than that of "entry." Id. at 412. Relying upon Taylor v. United States, 207 U.S. 120 (1907), the BIA found that a "landing was complete 'the moment the vessel [was] left and the shore ... reached.'" Id. Further, once physical presence occurred, the landing was ordinarily complete.[6] Id. Applying those principles to the case at hand, the BIA found that an individual coming to the U.S. by way of an international bridge "lands" when he touches U.S. soil. Since the alien landed at the port of entry in Lewiston, New York, a designated port of entry, and submitted to the inspection process, the BIA concluded the bridge owner's duty under § 1321 had been discharged.

Matter of Lewiston-Queenston establishes that an alien coming to the United States by way of an international bridge does not land until he touches U.S. soil. Because the BIA equated physical presence in the United States (touching United States soil) with landing, one can

---

[6] The BIA did note an exception to this general definition of landing in 8 U.S.C. § 1223(a), which provides that:

> Upon arrival at a port of the United States of any vessel or aircraft bringing aliens (including alien crewmen) the immigration officers may order a temporary removal of such aliens for examination and inspection at a designated time and place, but such temporary removal shall not be considered a landing, nor shall it relieve vessels or aircraft, the transportation lines, or the masters, commanding officers, agents, owners, or consignees of the vessel or aircraft upon which such aliens are brought to any port of the United States from any of the obligations which, in case such aliens remain on board, would, under the provisions of this Act bind such vessels or aircraft, transportation lines, masters, commanding officers, agents, owners, or consignees.

15

reasonably infer that physical presence on the international bridge did not constitute physical presence in the United States.

   C.  "Present in the United States" under 8 U.S.C. § 1225(a)(1)

  The prior concepts of when an alien is physically present in the United States should be applied to the interpretation of the current version of § 1225(a)(1). "[C]ongress is deemed to know the executive and judicial gloss given to certain language and thus adopts the existing interpretation unless it affirmatively acts to change the meaning." Bledsoe v. Palm Beach County Soil and Water Conservation District, 133 F.3d 816, 822 (11th Cir. 1998), citing Florida National Guard v. Federal Labor Relations Authority, 699 F.2d 1082, 1087 (11th Cir. 1983). In IIRIRA, Congress created a unified process, called a removal proceeding, to determine the inadmissibility or deportability of an alien. 8 U.S.C. § 1229a. Under the amended INA, an alien admitted to the United States is subject to deportability grounds, 8 U.S.C. § 1227(a), while an alien who has not, regardless of his or her location, is subject to inadmissbility grounds, 8 U.S.C. § 1182(a). Congress did not amend the INA to define or re-define terms such as "land" or "presence in the United States." Consequently, the interpretation of Congressional intent should be based on prior administrative and judicial interpretations, which Congress is presumed to know.

  The Migrant plaintiffs were physically present on a lighthouse which was anchored by pilings driven into the sea bed below, completely submerged under water. The lighthouse is not built or anchored to any dry land. In fact, in its current location, the lighthouse is located offshore and has never been connected to United States dry land. Pre-existing administrative and judicial interpretations of the term "land" provide that an alien arriving on a vessel lands when he leaves the vessel and comes ashore, Taylor v. United States; while an alien arriving on an aircraft

"lands" in the United States when he disembarks the aircraft, Correa. Since the plaintiffs arrived by vessel from Cuba, Taylor holds that they could not "land" in the United States until they left their vessel and came ashore. "'Landing from such vessel' takes place and is complete the moment the vessel is left and the shore reached." Taylor, 207 U.S. at 125. If landing is normally complete when physical presence occurs, Matter of Lewiston-Queenston Bridge at 414, it follows that the absence of a landing means that physical presence has not occurred. Therefore, an alien who remains onboard a docked vessel, not having come ashore, is not physically present, just as an airline passenger who has not disembarked the aircraft, is not physically present.

Landing is accomplished by coming ashore, disembarking an aircraft, or touching U.S. soil, in the case of aliens coming by an international bridge. In each instance, the alien is required to touch ground that is connected to the United States, such as a wharf, pier, tarmac at an airport, or airline terminal, in order to land. Mere physical presence on an aid to navigation or piling that is connected to the seafloor does not constitute coming ashore. Consequently, touching a lighthouse which is 6.5 nautical miles from shore, and anchored to a sea bed, completely submerged under water, cannot be viewed as coming ashore.

## CONCLUSION

The Migrant plaintiffs have failed to establish a substantial likelihood of success on the merits of their APA claim. The Coast Guard's decision was neither arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Therefore, the Migrant plaintiffs'

motion for preliminary injunction should be denied.

DATED:  May 26, 2016		Respectfully submitted,

					WIFREDO A. FERRER
					UNITED STATES ATTORNEY


				By:	__s/ Dexter A. Lee_____
					DEXTER A. LEE
					Assistant U.S. Attorney
					Fla. Bar No. 0936693
					99 N.E. 4th Street, Suite 300
					Miami, Florida  33132
					(305) 961-9320
					Fax:  (305) 530-7139
					E-mail:  dexter.lee@usdoj.gov

					ATTORNEY FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on May 26, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.


					___s/ Dexter A. Lee_____
					DEXTER A. LEE
					Assistant U.S. Attorney

## SERVICE LIST

Movimiento Democracia, et al. v. Jeh Charles Johnson, et al.,
Case No. 16-21868-CIV-GAYLES
United States District Court, Southern District of Florida

| | |
|---|---|
| William J. Sanchez, Esq. | Virlenys H. Palma, Esq. |
| 12600 S.W. 120th Street, Suite 102 | 303 N. Krome Avenue |
| Miami, Florida  33186 | Homestead, Florida  33030 |
| (305) 232-8889 | (786) 601-2293 |
| Fax:  (305) 232-8819 | Fax:  (786) 513-5700 |
| E-mail:  William@wsanchezlaw.com | E-mail:  vhpalma@gmail.com |

Luis Fernandez, Esq.  
2250 S.W. 3rd Avenue, Suite 303  
Miami, Florida  33129  
(305) 854-5955  
Fax:  (305) 854-5324  
E-mail:  lfernandez@aol.com  

Kendall Coffey, Esq.  
2665 S. Bayshore Drive  
Miami, Florida  33132  
(305) 857-9797  
Fax:  (305) 859-9919  
E-mail:  kcoffey@coffeyburlington.com  

Benedict P. Kuehne, Esq.  
100 S.W. 2nd Avenue  
Miami, Florida  33020  
(305) 524-1114  
Fax:  (305) 789-5987  
E-mail:  ben.kuehne@kuehnelaw.com  

ATTORNEYS FOR PLAINTIFFS

Wilfredo O. Allen, Esq.  
2250 S.W. 3rd Avenue, Suite 303  
Miami, Florida  33129  
(305) 854-5955  
Fax:  (305) 854-5324  
E-mail:  legalallen@aol.com  

Joseph Geller, Esq.  
2411 Hollywood Boulevard  
Hollywood, Florida  33020  
(954) 920-2300  
Fax:  (954) 920-6885  
E-mail:  joseph.geller@gmlaw.com  

Santiago Alpizar, Esq.  
1699 Coral Way  
Coral Gables, Florida  33145  
(305) 856-2494  
Fax:  (305) 854-9788  
E-mail:  alpizarlaw@gmail.com