## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:16-Civ-21868-GAYLES

**MOVIMIENTO DEMOCRACIA, INC., et al.,**
    **Plaintiffs,**

**versus**

**JEH CHARLES JOHNSON, Secretary,**
**Department of Homeland Security, et al.,**
    **Defendants.**
_____/

# PLAINTIFFS' MEMORANDUM OF LAW AND FACT IN SUPPORT OF DECLARATORY AND INJUNCTIVE RELIEF

The plaintiffs in this action are the twenty-one Cuban refugees who entered United States territorial waters by boat on May 20, 2016, and landed on United States property at the American Shoal Lighthouse located east of the Saddlebunch Keys, Monroe County, State of Florida, who are joined in this action by Movimiento Democracia, Inc., a Florida not-for-profit corporation that exists exclusively to assist in democracy-building programs involving Cuba and providing meaningful assistance to Cuban political prisoners and refugees seeking freedom in the United States. The plaintiffs have invoked this court's jurisdiction in order to obtain declaratory and injunctive relief requiring the U.S. Coast Guard

1

and the United States of America to award them refugee status under the Cuban Refugee Act of 1980, 8 U.S.C. §1521, and the Cuban Refugee Adjustment Act, 8 U.S.C. §1255. This memorandum of law demonstrates (1) the plaintiffs have standing to bring this action, (2) this court has jurisdiction to consider the plaintiffs' request, and (3) the plaintiffs are entitled to declaratory and injunctive relief.

## I.   RELEVANT FACTUAL BACKGROUND

1.   Shortly before May 20, 2016, plaintiffs Liban Concepcion Lio, Alexeis Leyva, Michael Perez Perez, Yordanki Perez Varea, Alexander Vergara Lopez, Jegnier Cepedes Almaguer, along with a number of others who are included among the plaintiffs in this litigation, departed from Cuba to the United States on board a small home-made vessel.

2.   After traveling for days under dangerous conditions on the high seas, risking their lives for a chance at freedom from the oppressive political persecution in Cuba, they arrived in United States territorial waters on May 20, 2016. As their vessel broke down and began to sink, the twenty-one (21) plaintiffs on board the vessel individuals climbed onto the American Shoal lighthouse, a federal building that is the property of the United States securely affixed to United States soil. The

lighthouse is located east of Saddlebunch Keys, just offshore from Sugarloaf Key, close to Looe Key, in Monroe County, Florida, in what is the territory of the United States.

3.     After some time, a U.S. Coast Guard cutter appeared nearby and a smaller vessel operated by Coast Guard personnel approached the lighthouse. After nine hours of negotiations between the Coast Guard and plaintiffs who were staying at the lighthouse, the plaintiffs agreed to leave the lighthouse and board the Coast Guard cutter. All twenty-one (21) plaintiffs were interdicted by the Coast Guard, including two (2) refugees who swam to the cutter. These two (2) had been on the American Shoal Lighthouse prior to swimming to the Coast Guard cutter. All plaintiffs immediately asserted their right to immigration relief pursuant to the wet foot/dry foot United States policy and United States laws, thereby entitling them to certain rights as refugees. The rights are established by the Cuban Refugee Act of 1980, 8 U.S.C. § 1521, the Cuban Refugee Adjustment Act, 8 U.S.C. §1255, and the Immigration and Nationality Act, 8 U.S.C. § 1253.

4.     By their presence on the American Shoal Lighthouse for more than a transitory period of time, all plaintiffs touched U.S. soil and

remained on the lighthouse for many hours before being convinced by the U.S. Coast Guard to board the awaiting cutter for health and safety reasons. All twenty-one (21) refugees had "dry feet" when transferred from the American Shoal Lighthouse to the cutter. All sought a meaningful opportunity to apply for political asylum, refugee status, and lawful permanent residency.

5.      Plaintiffs have remained aboard the Coast Guard cutter since the time of their transfer from the American Shoal Lighthouse.

6.      Plaintiffs have been denied access to their counsel and their family members. Before they departed Cuba, all plaintiffs made advance arrangements with their close friends and relatives to have contact made with Movimiento Democracia and its representatives immediately upon their arrival in United States territorial waters in order to obtain the assistance of American legal counsel for any matters associated with their entry to the United States.[1]

7.      During 2006, a similar group of Cubans refugees landed on the old Seven Mile Bridge in the Florida Keys. Those refugees were

---

[1] Incorporated as a Notice of Filing are declarations from family members of the plaintiffs/refuges attesting to the instructions given to them by the refugees to seek legal counsel on heir behalf.

immediately repatriated to Cuba by the U.S. Coast Guard, notwithstanding that they had reached "dry land" in the United States. Those refugees, through the assistance of Movimiento Democracia, brought a federal action for declaratory and injunctive relief to demand their refugee status pursuant to the Cuban Refugee Act of 1980, 8 U.S.C. § 1521, the Cuban Refugee Adjustment Act, 8 U.S.C. §1255, and the Immigration and Nationality Act, 8 U.S.C. § 1253. The ensuing litigation, District Court Case No. 06-20044-CIV-Moreno (S.D. Fla.), challenged the Coast Guard's erroneous interpretation of the "wet foot/dry foot" policy as it applies to Cuban refugees who reach United States land.[2] District Judge Moreno ruled in the refugees' favor, concluding the Coast Guard's actions were not a "reasonable" interpretation of "present executive policy." Judge Moreno ordered the United States to return the refugees to the United States to claim their refugee status. Judge Moreno's order was followed by the United States.

8.    In this case, all twenty-one (21) plaintiff refugees were

---

[2] "**Error! Main Document Only.**Wet Foot/Dry Foot" is the moniker for the policy instituted by the immigration agreement of May 2, 1995. It is thus named because unless a Cuban national actually touches U.S. territory (and therefore presumably has "dry feet"), the U.S. Coast Guard repatriates such refugee to Cuba.

interviewed aboard the cutter but were denied their right to refugee status in the United States. The Coast Guard incorrectly treated the American Shoal Lighthouse as merely a "navigational aid" and not an existing structure permanently affixed to United States soil in United States territory. Yet, the American Shoal Lighthouse is a prominent permanent structure erected on a four-acre island within the Florida Keys comprising a land mass previously owned by the State of Florida but relinquished to the United States Government more than one century ago, during 1878-1879. The lighthouse building itself is permanent, non-moving, firmly affixed to the land mass and grounded by nine pieces of mangrove wood tipped with iron and sunk ten feet into the reef.  The Lighthouse is within the boundaries of the continental shelf which extends up to one hundred eighty meters of depth, with the surrounding waters of the American Shoal Lighthouse less than ten feet deep.

9.     In accordance with the United Nations Convention of the Law of the Sea (UNCLOS), the American Shoal Lighthouse is a permanent continuation of the United States land territory.

10.    Presently, the American Shoal Lighthouse was deactivated since 2015, replaced by a thirty foot tall navigational aid erected nearby.

11.   The American Shoal Lighthouse remains a land building permanently affixed to the land, and is considered a historical landmark whose image has been recreated on an official U.S. postal stamp.

## II.   PLAINTIFFS HAVE STANDING

### A.   Plaintiffs Have Shown Sufficient Injury to Support Their Standing

The doctrine of standing ensures that the resources of a federal court are devoted to disputes in which the parties have a concrete stake. *Cf. Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 191 (2000).  Among the prudential restrictions on the doctrine of standing is the general requirement that a litigant must assert his or her own legal rights and cannot usually assert the legal rights of a third party — the overarching concern being that third parties will not adequately represent the individuals whose rights they seek to vindicate.

In certain circumstances, the Supreme Court has recognized the right of litigants to bring actions on behalf of third parties, provided the following factual elements[3] are satisfied: a) the litigant must have

---

[3] **Error! Main Document Only.** The Eleventh Circuit indicated that with

suffered an "injury in fact" that gives him or her a "sufficiently concrete interest" in the outcome of the dispute; b) the litigant must have a close relation to the third party;  c) and there must exist some hindrance to the third party's ability to protect his or her own interests. *Singleton v. Wulff,* 428 U.S. 106 (1976).

In *Singleton*, two Missouri physicians who performed non-medically indicated abortions challenged the constitutionality of a Missouri statute excluding Medicaid coverage for needy persons electing to have such abortions. The Supreme Court held that the physicians had standing to maintain the suit and noted, 428 U.S. at 114-116 (citations omitted):

> Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party…[l]ike any general rule, however, this one should not be applied where its underlying justifications are absent.

> With this in mind, the Court has looked primarily to two factual elements to determine whether the rule should apply in a particular case. The first is the relationship of the litigant to the person whose right he seeks to assert. If the enjoyment of the right is inextricably bound up with the activity the

---

regards to the "factual elements" requirements, there is a lack of clarity as to how the factors should be applied and whether <u>all</u> the factors must be met in order to justify third-party standing. *Harris v. Evans*,  20 F.3d 1118, 1122 Fn 6 (11th Cir. 1994) (court did not need to rule on the issue of whether all factors must be met because *pro se* inmate lacked third-party standing to assert First Amendment rights of prison guards).

litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit. Furthermore, the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.

\*\*\*

The other factual element to which the Court has looked is the ability of the third party to assert his own right. Even where the relationship is close, the reasons for requiring persons to assert their own rights will normally still apply. If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent.

Just like the physicians in *Singleton*, the refugee-plaintiffs are represented in court by Movimiento Democracia because they are themselves being denied access to counsel and being held incommunicado, notwithstanding they have claimed their entitlement to rights as refugees, and instructed their families to contact Movimiento Democracia to obtain legal counsel for them. Thus, Movimiento Democracia is the best available proponent of the rights of persons who cannot speak for themselves — the twenty-one (21) Cuban refugees who reached United States territory and thereby obtained refugee status, yet have been detained in custody by the U.S. Coast Guard.

All of the plaintiffs/refugees in this matter have satisfied the factual elements of *Singleton* by having instructed their families to arrange for Movimiento Democracia to assist in obtaining their legal representation. Movimiento Democracia is uniquely suited to bring suit on behalf of the plaintiffs/refugees who are as yet unable to personally petition the court. The refugees' interests are germane to the organizational purpose, and neither the claims asserted nor the relief requested requires the actual participation of the individual refugees. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167 (2000).

Movimiento Democracia is a non-profit organization dedicated to upholding the basic tenets of a society that respects, upholds, and protects the human rights of all persons, particularly those of Cuban nationals presently living in Castro's regime who cannot openly voice their dissent or otherwise assert their basic human rights due to the totalitarian restrictions imposed by Castro's regime. Movimiento Democracia has an inherent stake in preserving the right of all families to be united, particularly those Cuban families separated by an exile borne out of desperation and a need to escape the repressive constraints on freedom imposed by the Castro regime on its citizens. In attempting

to repatriate the twenty-one (21) Cuban exiles to Cuba, the U.S. Coast Guard exposed these Cuban nationals to a greater degree of repression, reprisals, and further violations of basic human rights — something Movimiento Democracia has a direct stake in eradicating.

### B.    Plaintiffs Are Eligible for Next Friend Standing

Additionally, the accepted doctrine of "next friend standing" supports the plaintiffs' entitlement to maintain this action. The federal immigration process routinely recognizes the ability of persons to petition for immigration relief on behalf of beneficiaries, identical to the process utilized herein. Immigration Form G-28 addresses some of the "next friend" issues by incorporating the provisions of 8 CFR §102.3 (a)(3). That regulation states, in part:

> (3) Representation. An applicant or petitioner may be represented by an attorney in the United States, as defined in § 1.2 of this chapter, by an attorney outside the United States as defined in § 292.1(a)(6) of this chapter, or by an accredited representative as defined in § 292.1(a)(4) of this chapter.

In the present case, the Cuban refugees on board the U.S. Coast Guard cutter instructed their family members to arrange for their representation, and family members have signed G-28s on behalf of their relatives in Coast Guard custody. This representation request by close

11

family members of the refugees held incommunicado satisfies the "next friend' standing principle originated in connection with petitions for habeas corpus, when American courts allowed "next friends" to appear "on behalf of detained prisoners who [were] unable, usually because of mental incompetence or inaccessibility, to seek relief themselves." Whitmore v. Arkansas, 495 U.S. 145, 162, 110 S. Ct. 1717, 1726 (1990). Congress statutorily authorized "next friend" standing in the habeas corpus context in 1948, amending the habeas corpus statute to allow petitions to be "signed and verified by the person for whose relief it is intended or by someone acting in his behalf." *See id.* at 162-63 (quoting 28 U.S.C. § 2242) (emphasis in original).

The *Whitmore* Court set forth "two firmly rooted prerequisites" that must be satisfied in order for an individual to be accorded standing to proceed as another's "next friend." *See id.* at 163. First, the "'next friend' must provide an adequate explanation – such as inaccessibility, mental incompetence, or other disability – why the real party in interest cannot appear on his own behalf to prosecute the action." *Id*. Second, "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." *Id*. Whitmore further suggested that –

while not necessarily a "firmly rooted prerequisite" to "next friend" standing – a "next friend" must also "have some significant relationship with the real party in interest." *Id*. at 164.

These firmly rooted prerequisites are clearly met in this case. It is without question that the real party in interest, the interdicted refugees currently on the cutter, cannot appear on their own behalf to prosecute the action due to their detention by the Coast Guard. Yet, previously instructed their families to arrange for Movimiento Democracia to engage counsel for them in connection with any refugee and immigration assistance. As such, the "next friend" in the position of the non-profit Movimiento Democracia is truly dedicated to the interests of the refugees, since it has been contacted by the refugees' close family members to act in their best interests.

## C. Plaintiffs Are In the Zone of Interest Provided for Under the Administrative Procedures Act, 5 U.S.C. § 702

Finally, for standing purposes the plaintiffs have satisfied standing requirements as persons in the zone of interest provided for in 5 U.S.C.§ 702, which states in part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the

meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

This statutory provision is reason enough to allow the plaintiffs to plead their case through their lawyers and next friend Movimiento Democracia. The complaint presents sufficient legal claims supported by documentation and affidavits to justify the initiation of this lawsuit and to protect the plaintiffs from being repatriated to Cuba in violation of United States law. All twenty-one (21) Cuban refugee plaintiffs actually landed in the United States and are therefore entitled to due process and statutory protections. The plaintiffs have identified the statutory and constitutional wrongs that are appropriately the subject of judicial review. The plaintiffs' standing to initiate and participate in this litigation stems from the very conduct of the defendants.

## III. This Court's Consideration Is Not Limited by Informal Adjudication under the Administrative Procedures Act

### A. There is No Basis for Limiting This Court's Authority as an APA Informal Adjudication

The government's argument, made for the first time at Friday's Status Conference, that this Court's decision-making authority is limited

14

because this is an informal adjudication under the Administrative Procedures Act ("APA") is a creative but untenable stretch of law and fact that does not reflect what actually happened here. This contention was never made at any time in the case before District Judge Moreno, nor has the APA even been referenced in the defendants' written submission in the present case. Indeed, this lawsuit does not seek review of any administrative adjudication any more than the daily detentions, arrests, and searches by myriad federal agents and agencies constitute APA adjudications.

To the contrary, the Coast Guard actions at issue in this litigation are purely operational and enforcement matters that are not quasi-judicial. Accordingly, the Coast Guard action is only an enforcement action described in a declaration by a Coast Guard attorney submitted for the first time in this litigation. Like other operational activity by an executive branch agency, the plaintiffs' detention occurred without the benefit of any formal procedures, much less a right to be heard by the aggrieved parties or to be represented by counsel. Strikingly, there is no written decision signed by a duly authorized neutral decision-maker or any initiation of adjudicatory review by the invocation of legal

procedures.

Nor has the government presented any explanation of the procedures applied to make the resulting determination. Glaringly absent is any administrative record; plainly, no record exists that sets out any basis for an administrative adjudication. Thus, as is apparent from the government's own submissions, the U.S. Coast Guard action is not the product of any duly promulgated regulation or other procedure followed "in a manner similar to formal rulemaking." *Nodarse v. Barnhart*, 319 F. Supp. 2d 1333, 1339 (S.D. Fla. 2004), citing *United States v. Mead Corp.*, 533 U.S. 218, 230-231 (2001). As a result, the Coast Guard's operation does not invoke *Chevron* deference or other legal principles that limit this Court's decision-making authority.

Even if there had been an actual adjudication, little deference would apply in any event. The Supreme Court in *Christensen v. Harris Co.*, 579 U.S. 576, 586-87 (2000), held that:

> Here, however, we confront an interpretation contained in an opinion letter, not one arrived at after, for example, a formal adjudication or notice-and comment rulemaking. Interpretations such as those in opinion letters-like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference.

While *Christensen* is surprisingly overlooked in the government's motion, its analysis undeniably governs the present controversy. In *Christensen*, the Court ruled that an agency's one-sided opinion letter does not require federal courts to stand back from their normal duties to construe federal law and adjudicate federal rights. To say the least, such letters do not limit the authority of an Article Ill court to make its own decision:

> Instead, interpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), but only to the extent that those interpretations have the 'power to persuade,' *ibid. See Arabian Oil Co.*, *supra*, at 256-258. As explained above, we find unpersuasive the agency's interpretation of the statute at issue in this case.

529 U.S. at 587. Because the *Skidmore* methodology accords judicial respect based on an agency's persuasiveness on the merits – not due to a deferential multiplier –the *Christensen* Court rejected a Department of Labor opinion letter concerning overtime practices.

Following the clarification in *Christensen*, the Supreme Court emphasized yet again the significant limitations concerning *Chevron* deference in *United States v. Mead Corp.*, 533 U.S. 218 (2001). In underscoring those limits, the Court held that letters issued by U.S. Customs setting forth tariff rulings in individual cases did not warrant

17

judicial deference under *Chevron*, 533 U.S. at 234:

> In sum, classification rulings are best treated like 'interpretations contained in policy statements, agency manuals and enforcement guidelines.' *Christensen*, 529 US. at 587. They are beyond the *Chevron* pale.

Therefore, applying the different standard of review mandated by *Skidmore*, the Court ruled that the agency's letter rulings concerning customs tariffs would deserve such weight-and only such weight – as might be found in the logic and reasoning of their "power to persuade." 533 U.S. at 235.

Following these holdings, in *London v. Fieldale Farms Corp.*, 410 F.3d 1295 (11th Cir. 2005), the Eleventh Circuit jettisoned the *Chevron* deference claim of the Secretary of Agriculture. Applying the *Mead* methodology, the Eleventh Circuit disallowed *Chevron* deference and found there was no specific congressional delegation to the Secretary to adjudicate issues concerning the challenged statute:

> …'[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'

*Shotz v. City of Plantation*, 344 F.3d 1161, 1178 (11th Cir. 2003), quoting

*Mead*, 533 U.S. at 227. Similarly, in *Wilderness Watch v. Mainella*, 375 F.3d 1085 (11th Cir. 2004), the court expressly acknowledged that *Chevron* had been "clarified" by *Mead. See also Wilderness Watch*, 375 F.3d at 1091 n. 7 ("We note, however, that when, as here, the agency interpretation does not constitute the exercise of its formal rule-making authority, we accord the agency consideration based upon the factors cited in Skidmore ... '). *See also Alabama Power Co. v. United States Dept. of Energy*, 307 F.3d 1300, 1312 (11th Cir. 2002).

Applying these principles, this district properly embraced the *Chevron* modification effected in *Mead* and *Christensen* by denying *Chevron* deference in *Nodarse v. Barnhart*, 319 F. Supp. 2d 1333 (S.D. Fla. 2004). In rejecting the Commissioner of Social Security's position concerning an applicant's eligibility for certain benefits, this court took issue with the government's insistence that *Chevron* required a United States District Judge to accept an unpersuasive legal position from a federal agency:

> In recent years, the Supreme Court has clarified that deference to the degree required by *Chevron* is only warranted where the statutory interpretation is recorded in a regulation that was subject to notice and comment rulemaking or was promulgated in a manner similar to formal rulemaking.

319 F. Supp. 2d at 1339, citing *Mead*, 533 U.S. at 230-231. As the court correctly found: "The ORR's State Letter SL-007 is not a regulation that was subject to notice-and-comment or other procedures similar to formal rulemaking. Thus, the Court is not required to defer to the ORR interpretation, but rather may simply evaluate its persuasiveness, as the Court would when looking at case law from a different circuit." 319 F. Supp. 2d at 1339-1340, citing *Christensen*, 529 U.S. at 587. As a result, current Supreme Court doctrine, faithfully applied in this circuit and district, overwhelms the government's insistence that this court has such a limited role in determining whether these Cuban refugees were in fact "present in the United States." *See also National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 111 n.6 (2002) (EEOC'S interpretative guidelines receive deference "but only to the extent that those interpretations have the power to persuade.").

### B.   This is a Case Involves a Litigating Position and Not an Adjudication by the Coast Guard

As described earlier, this controversy is not based on a prior adjudication by the Coast Guard. Rather than an adjudication resulting from a defined and fair process, this case presents a unilateral enforcement operation with a brief, after-the-fact description provided –

in response to this lawsuit – in a declaration of a Coast Guard lawyer. This is not an administrative adjudication; this is a litigating position. *Bradberry v. Director, Office of Workers' Compensation Programs*, 117 F.3d 1361, 1366 (11th Cir. 1997) ("However, we need not defer to a 'mere litigating position.'"), citing *William Bros., Inc. v. Pate*, 833 F.2d 261, 265 (11th Cir. 1987) (no deference to a litigating position). As a matter of analysis, such a "litigating position" differs fundamentally from pre-controversy rules or written policies or even a pre-suit adjudication that were developed by an agency in a truly deliberative, neutral context, based on a "longstanding policy on the subject" or "an agency's consistent interpretation of its own regulation." *Bradberry*, 117 F.3d at 1366. *See also Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 212 (1988); *Bianco v. Georgia Pacific Corp.*, 304 F.3d 1053, 1056 n. 3 (11th Cir. 2002) ("While we consider the Director's position in this appeal, we do not defer to that position."); *see also Williams Bros.*, 833 F.2d at 265 ("... we do not agree that the Director's mere litigating position is due to be given deference.").

In all events, the government's position is not enveloped by *Chevron* but instead deserves only as much – or as little – respect as its

persuasiveness – or unpersuasiveness – may warrant. *Bradbury*, 117 F.3d at 1366.  The government's persuasiveness in insisting that these refugees had not arrived in the United States fails both the test of common sense as well as practical and legal authority defining the American Shoal Lighthouse as a federal building on sovereign federal property.

## IV.  SUBSTANTIAL  CONSTITUTIONAL  CONCERNS UNDERMINE THE GOVERNMENT'S INTERPRETATION

This court should also reject the defendants' implausible statutory interpretation of "present in the United States" in order to avoid the substantial constitutional issues that such a position presents. *See generally Solid Waste Agency of N. Cook Co. v. U.S. Army Corp. of Engineers*, 531 U.S. 159, 173 (2001) ("Thus, 'where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the Intent of Congress.'"). In applying this bedrock principle to an analogous immigration scenario, the Supreme Court last term explained:

> Indeed, one of the canon's chief justifications is that it allows courts to avoid the decision of constitutional questions. It is a tool for choosing between competing plausible

interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.

*Clark v. Martinez*, 543 U.S. 371, 125 S. Ct. 715, 724 (2005).

In the present case, the defendants' contention that "present" on the American Shoal Lighthouse does not constitute "present in the United States" under federal law is untenable as a matter of basic statutory construction. The Coast Guard's apparent conclusion that the United States Constitution does not exist on this federal building under federal jurisdiction nonetheless fails because the Due Process Clause reaches all persons within the United States, as the Supreme Court explicitly decreed:

> There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. *Wong Yang Sung v. McGrath*, 339 U.S. 33, 48-51 (1950); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896); *Russian Fleet v. United States*, 282 U.S. 481, 489 (1931). Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.

*Mathews v. Diaz*, 426 U.S. 67, 77 (1976). Evidently, conceding that the plaintiffs are people, the defendants imagine reasons to deny that they were actually situated in the United States, in a United States building,

23

owned by a government, notwithstanding the manifest reality that our territories extend twelve nautical miles from our shores. *Matter of Air Crash Off Long Island*, 209 F.3d 200, 212 (2d Cir. 2000) (twelve-mile limit), citing Presidential Proclamation No. 5928 (1988).

But no agency can dictate to a federal court concerning what constitutes the United States for constitutional purposes. Accordingly, because the American Shoal Lighthouse is in the United States – indeed, its very name signifies its presence in the United States – the Due Process Clause does not ignore the human beings who stood there. *Mathews*, 426 U.S. at 77. Therefore, rather than a question of whether they have any protectable interests under the U.S. Constitution, the only real issue is defining the dimensions of those rights.

While there is no independent constitutional right for an alien to remain in this country, the right to seek asylum is universally respected in our system of laws and governance. *See Augustin v. Sara*, 735 F.2d 32, 36 (2d Cir. 1984) (due process right to apply for asylum); *Selgeka v. Carroll*, 184 F .3d 337, 341-42 (4th Cir. 1999) (stowaway has due process right to seek asylum); *Marincas v. Lewis*, 92 F .3d 195 (3d Cir. 1996) (due process for stowaway founded on statutory principles). In these decisions,

the courts found no independent constitutional right to asylum, but they determined that aliens "do have such statutory rights as Congress grants." *Augustin*, 735 F .2d at 36. Because the Refugee Act of 1980, 8 U.S.C. § 1158, conferred upon aliens a substantive entitlement to seek asylum, the courts have ruled that, while a grant of asylum to remain here is itself discretionary, the right to apply for asylum and receive a fair hearing requires adequate procedural safeguards. *Augustin*, 735 F.2d at 37.

While the Eleventh Circuit does not recognize a constitutional right to seek asylum, *Jean v. Nelson*, 727 F.2d 957 (11th Cir. 1984), the statutory construction of the asylum laws should be examined in light of *Zadvydas v. Davis*, 533 U.S. 678 (2001), and *Clark v. Martinez*, 543 U.S. 371, 125 S. Ct. 716 (2005). In *Clark*, the Supreme Court rejected analogous attempts by the government to distinguish between "admitted aliens" and "inadmissible aliens," that is, those who, like the plaintiffs in the present case, allegedly "have not yet gained initial admission ...." 125 S. Ct. at 723. While accepting the government's contention that the Mariel Cubans were "inadmissible" for immigration law purposes, the Court in *Clark* nevertheless refused to allow the government to keep

them in indefinite detention. Finding that the statute governing detention, 8 U.S.C. § 1231 (a)(6)did not expressly differentiate between the admitted and non-admitted aliens, the Court found it should avoid the constitutional problems implicated by any interpretation that would impose such a distinction. 125 S. Ct. at 723-725, citing *Zadvydas v. Davis*, 533 U.S. 678 (2001). Rather than adopt the government's position that inadmissible aliens could be detained indefinitely, the Court opted for the construction that posed no due process concerns. "If one of them would raise a multitude of constitutional problems, the other should prevail ...." 125 S. Ct. at 724.

That analysis governs the present controversy. As in *Clark*, the operative language in the present case – "Any alien who is present in the United States ..." (8 U.S.C. § 1158(a)) – contains no differentiation concerning admitted and non-admitted aliens. To avoid the constitutional question, as mandated in *Clark*, this court should conclude that the plaintiffs, whether admitted or not, had the constitutionally respected right to apply for asylum because they were present in the United States. Under any view of the dimensions of the right to apply for asylum, a summary repatriation constitutes an egregious violation of

Due Process. *Segelka v. Carroll*, 184 F.3d 337 (4th Cir. 1999). *See generally Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 680 (9th Cir. 2005) ("moreover, the Fifth Amendment's Due Process clause applies to all 'persons' within the United States, including aliens"), citing *Zadvydas v. Davis*, 533 U.S. at 693.

## V. The American Shoal Lighthouse Is a Federal Building on Federal Property

Consistent with the government's longstanding "Wet Foot/Dry Foot" immigration policy, plaintiffs' purposeful presence in a federal building on federal property within the United States – the American Shoal Lighthouse – compels the conclusion they are present in the United States and thereby entitled to remain and seek adjustment of their status as arriving refugees. It is undisputed that the American Shoal Lighthouse ("Lighthouse") is a permanent building that was built to be occupied; it was erected on the submerged land of the United States; it is a charted piece of the United States. As is acknowledged by the defendants, this federal building is situated within the territorial limits of the United States. Equally clear is the fact that the submerged land upon which it is built constitutes United States land as is established by legislation, Presidential Order, and international treaty provisions.

The Outer Continental Shelf Lands Act, 43 U.S.C.A. §§ 1332, 1333,

provides in part:

> It is hereby declared to be the policy of the United States that –
>
> (1) the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition as provided in this subchapter;

Also establishing the character of the lighthouse as a federal building on

federal land is Section 1333 of the Act:

**(a) Constitution and United States laws; laws of adjacent States; publication of projected State lines; international boundary disputes; restriction on State taxation and jurisdiction**

(1) The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State: Provided, however, That mineral leases on the outer Continental Shelf shall be maintained or issued only under the provisions of this subchapter.

(2)(A) To the extent that they are applicable and not

inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf, and the President shall determine and publish in the Federal Register such projected lines extending seaward and defining each such area. All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States. State taxation laws shall not apply to the outer Continental Shelf.

(B) Within one year after September 18, 1978, the President shall establish procedures for setting1 any outstanding international boundary dispute respecting the outer Continental Shelf.

(2) The provisions of this section for adoption of State law as the law of the United States shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf, or the property and natural resources thereof or the revenues therefrom.

The government's position in this litigation is at odds with the congressional mandate that both the "Constitution and laws" and federal jurisdiction include "the subsoil and seabed". Further support for the legal and factual position advanced by the plaintiffs that this federal building is federal dry land within the United States is found in

Executive Order 13158 which includes "submerged lands thereunder, over which the United States exercises jurisdiction, consistent with international law." Additionally, international law, as reflected in The United Nations Law of the Sea Convention, acknowledged in U.S. law in 18 U.S.C.A. § 2281a, confirms the exclusive jurisdiction of the United States over "artificial islands, installations and structures" and expressly includes installations and structures situated on the Continental Shelf. *See* Art. 80, The Law of the Sea Convention.

Given that the plaintiff/refugees were standing with dry feet on a dry federal building on federal land during the course of their encounter with the Coast Guard, it is unreasonable to treat them as being interdicted on the high seas. Plainly, they were present in the United States as a matter of law; the Coast Guard's attempt to repatriate them involuntarily must be rejected.

## VI. THE REFUGEE PLAINTIFFS' ARRIVAL ON THE AMERICAN SHOAL LIGHTHOUSE CONSTITUTES PRESENCE IN THE UNITED STATES UNDER 8 U.S.C. §1225(a)(1) AND "PHYSICALLY PRESENT IN THE UNITED STATES" PURSUANT TO 8 U.S.C. § 1158(a)

United States law, in 8 U.S.C. § 1225 is applicable only to matters involving inspection by immigration officers, expedited removal of

inadmissible arriving aliens, and referrals for hearing. The plain language of § 1225(a)(1) describes the inspection process for aliens:

> (a) Inspection
> (1) Aliens treated as applicants for admission
> An alien present in the United Sates who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

The refugee plaintiffs were "present in the United States" at the Lighthouse when they were apprehended by the U.S. Coast Guard, even if they had not yet been admitted. Similarly, the plaintiffs were undeniably "physically present in the United States" for the purpose of invoking federal asylum processes:

> § 1158.  Asylum
> (a) Authority to apply for asylum.  (1) In general. Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 235(b) [8 USCS § 1225].

Something so fundamental as the plain meaning of the "United States" should not be the subject of verbal gymnastics that turn common sense on its head. A contrary construction of a lighthouse building on

United States land engenders the kind of mistrust of government that results from irrational applications of the law. Having been present on United States land in a United States building, the refugee plaintiffs should not have been subject to interdiction by the Coast Guard since they had not been found on international or United States waters. Instead, they were found – with their dry feet – on the Lighthouse property, constructed and situated within the United States and the State of Florida, a presence indistinguishable from United States soil. Thus, removing an alien from a lighthouse in the United States is equivalent to removing that alien from United States land.

A lighthouse building built within and remaining in the State of Florida is obviously a fundamentally different matter than United States waters. It matters not whether the Lighthouse is still in actual use, because it remains a United States building whether or not occupied. Nor is there any statutory authority, regulation, or interpretive decision that defines land as excluding a permanently constructed lighthouse building. There is no authority supporting the view that the Immigration and Nationality Act is subject to transitory application defined by the occurrence of whether a federal building is in actual use.

While the text of § 1225 (a)(1) allows for the application of two separate clauses, there can be no convincing argument that the refugees do not find protection under both provisions. Notwithstanding the government opposition, Clause two is applicable to the case of refugees landing on a lighthouse constructed in the United States and long serving the people of Florida and the interests of the United States.

Clause two of §1225 (a)(1) pertains to aliens who arrive in the United States (whether or not at a designated port of entry), including aliens brought into the United States after having been interdicted in international or United States waters. The refugee plaintiffs here were not brought into the United States after interdiction – indeed, they landed at an existing lighthouse on their own – but were already physically present on the lighthouse when apprehended by the U.S. Coast Guard. These refugees were in the United States, although not at a designated port of entry. They are therefore entitled to the protections of the admissions process.

Under any view, the asylum law, § 1158(a) ("Any alien physically present in the United States...") contains no basis for differentiation between admitted vs. non-admitted aliens. Indeed, by its terms, the

statute applies "irrespective of such alien's status."

No cited authority refers to several decisions in fashioning its argument, but none exclude the plaintiffs from the relief requested. *Neither Yang v. Maugans*, 68 F. 3d 1540 (3rd Cir. 1995), *Zhang v. Slattery*, 55 F.3d 732 (2d Cir.1995), or *Chen Zhou Chai v. Carrott*, 48 F.3d 1331 (4th Cir. 1995), involve the application of the Immigration and Nationality Act (INA) to individuals intercepted in United States territorial waters, and therefore have no application here. Even *Matter of Lewiston-Queenston Bridge*, 17 I & N Dec. 410 (BIA, 1980), 1980 WL 121906 (BIA), involving attempted entry across an international bridge. As has been demonstrated overwhelmingly, the American Shoal Lighthouse was owned and maintained by the United States, not a foreign country. Nor did *Matter of Lewiston-Queenston Bridge* involve application of the "wet foot/dry foot" policy, making its application otherwise questionable.

The BIA in *Lewiston* relied on *Taylor v. United States*, 207 U.S. 120 (1907), in finding that a "landing was complete 'the moment the vessel was left and the shore reached'." *Id*. The Board continued by stating that once physical presence occurred, the landing was ordinarily complete.

34

Similarly, the plaintiff refugees' physical presence occurred when they disembarked on the lighthouse and thus "landed" in the United States. Accordingly, they are entitled to the protections of the Constitution and the applicable statutes.

The plaintiffs' position is further supported by the case law involving aliens who had entered the United States and were therefore present on United States territory. In those instances, the aliens are entitled to due process protections. For example, *Matter of Pierre*, 14 I & N Dec. 467 (BIA 1973), is the landmark Board of Immigration Appeals decision regarding entry into the United States. Prior to the enactment of IIRIRA, aliens were treated with separate procedures for deportation or removal depending on whether they had made an entry into the country. An entry involves: (1) a crossing into the territorial limits of the United States, i.e. physical presence; (2)(a) an inspection and admission by an immigration officer, or (b) actual and international evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

Historically, the entry "fiction" issue was used by courts to define whether aliens were present on United States territory for purposes of

determining the status of applicants for admission as well as whether they had arrived but had not yet made an entry. *See Correa v. Thornburgh*, 901 F.2d 1166 (2nd Cir. 1990); *Assa v. United States Attorney General*, 332 F.3d 1321, 1326 (11th Cir. 2003). Excludable aliens were those who sought admission but had not been granted entry into the United States. Even if physically present in this country, excludable aliens were legally considered as detained at the border. Deportable aliens, on the other hand, had succeeded in gaining entry into the United States, whether legally or illegally. *Fernandez-Roque v. Smith*, 734 F.2d 576, 578 n.2 (11th Cir. 1984).

But this case is not controlled by quibbling over traditional entry technicalities. Here, as in *Correa*, *supra*, the language of "physically present" is directly relevant. In *Correa*, the court held that an alien who arrived by airplane from a foreign country was "physically present" when she disembarked her flight in Houston. *Id.* at 1171-72. Similarly, the refugee plaintiffs in this matter were physically present when they disembarked their vessel in South Florida and placed themselves on the lighthouse. They, too, are entitled to due process protections.

There is no statutory requirement of a "landing" in statutes such as

36

§ 1158(a). And even if a "landing" were required, it is inescapable that disembarking from a vessel and relocating to a lighthouse inside the United States and the State of Florida constitutes a "landing." Under any applicable scenario, the refugee plaintiffs satisfied the physical presence element when they physically landed and disembarked on the lighthouse.

The U.S. Coast Guard has previously declared that a landing results from a "touch" to land. That is a commonsense interpretation of the law of landing, not impacted by a case-specific application. Thus, even applying longstanding, pre-litigation positions, the refugees did much more than what is required by the Coast Guard; they actually landed on and occupied the lighthouse building and waited for hours before being retrieved.

## VII. THE REFUGEES LANDED OUTSIDE ADMIRALTY JURISDICTION

It is grimly ironic that the world's greatest democracy would take the severe action of seeking to repatriate refugees fleeing Cuba's communist dictatorship because they landed on a closed lighthouse. The policy is called wet foot/dry foot. The lighthouse was dry. They had disembarked from a boat. Their feet were dry until they swam to the U.S. Coast Guard vessel as directed. There is nothing in any policy guideline

about a lighthouse not being land.

The ability of the Coast Guard to decide what constitutes land becomes seasonal and arbitrary. For example, does a lighthouse that becomes disused not then qualify as a building or structure? The lighthouse has never been abandoned, and is now a storied part of Florida and United States history, an essential ingredient of commerce within the United States.

Nor can the lighthouse be deemed a "vessel" since a vessel is defined as "A general term or all craft capable of floating on water and larger than a rowboat. The term vessel includes every description of water craft or other artificial contrivance used or capable of being used as a means of transportation on water ..." International Maritime Dictionary, Second Edition (DeKerchove). Vessel, defined under § 327.02(37), Florida Statutes, is synonymous with a boat as referenced in Art. VII, § 1(b), of the Florida Constitution, including every description of water craft, barge, and air boat, other than a seaplane on the water, used or capable of being used as a means of transportation. Even a floating structure under § 327.07(9), referring to items not on land and not for transportation but yet floating in the water, is not regarded as a vessel.

Rather than a "vessel," the building at issue is a firmly constructed, immovable, secured structure. It plainly constitutes a landed structure and even land itself. It does not float. It does not move. It does not disappear. It is dry. *See also Whittington v. Sewer Construction Company, Inc.*, 541 F.2d. 427 (4th Cir. 1976) (concluding that a bridge is not a "vessel" within admiralty jurisdiction). Thus, refugees here disembarked from a vessel and alighted on dry land – a lighthouse. They did not move from one vessel to another, since the lighthouse cannot be considered a marine vessel.

Of note is the case of *Myrick v. Teledyne Movible Offshore, Inc.*, 516 F. Supp. 602 (S.D. Tex. 1981). That court likewise held that an oil rig was not a vessel, and that a party was deemed not to come within the Death on the High Seas Act. Just as there was no admiralty jurisdiction in *Mynick*, there is none in this case. As such, because the plaintiffs landed, disembarked, and had dry feet, the laws of the United States require that the refugees are entitled to statutory and due process protections, not an administrative repatriation without a hearing.

## VIII. CONCLUSION.

The plaintiffs are entitled to declaratory and injunctive relief, and

an order that they be returned to the United States to be processed as

Cuban refugees on dry land.

Respectfully submitted,

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**LAW OFFICE OF BENEDICT**
**P. KUEHNE, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

**COFFEY BURLINGTON PL**
2601 S Bayshore Dr Ph 1
Miami, FL 33133-5417
Tel: 305-858-2900 x203
Fax: 305-858-5261
kcoffey@coffeyburlington.com

By:   *S/ Kendall Coffey*
      **KENDALL COFFEY**
      Florida Bar No. 259861

**LUIS FERNANDEZ, P.A.**
2250 S.W. 3rd Avenue, Suite 303
Miami, FL 33129
Tel: 305-854-5955
Fax: 305-854-5324

By:   *S/ Luis Fernandez*

40

**LUIS FERNANDEZ**
Florida Bar No. 0271578

**WILLIAM J. SANCHEZ, P.A.**
12600 SW 120 Street, Suite 102
Miami, FL 33186
Tel: 305.232.8889
Fax: 305.232.8819
william@wsanchezlaw.com

By:     *S/ William J. Sanchez*
          **WILLIAM J. SANCHEZ**
          Florida Bar No.  749060

**GREENSPOON MARDER**
200 E Broward Blvd Ste 1500
Fort Lauderdale, FL 33301-1874
Tel: 954-491-1120 x1193
Joseph.Geller@gmlaw.com

By:     *S/ Joseph S. Geller*
          **JOSEPH S. GELLER**
          Florida Bar No. 292771

**SANTIAGO ALPIZAR, P.A.**
1699 Coral Way Ste 512
Miami, FL 33145-2860
Tel: 305-856-2494
Fax: 305-854-9788
alpizarlaw@gmail.com

By:     *S/ Santiago Alpizar*
          **SANTIAGO ALPIZAR**
          Florida Bar No. 657263

**VIRLENYS H. PALMA**
303 N Krome Avenue
Homestead, FL 33030
Tel: 786.601.2293
vhpalma@gmail.com

By:     *S/ Virlenys H. Palma*
          **VIRLENYS H. PALMA**
          Florida Bar No. 15347

**WILFREDO O. ALLEN**
2250 SW 3 Avenue, Suite 303
Miami, FL 33129
Tel: 305.854.5955
Legalallen@aol.com

By:     *S/ Wilfredo O. Allen*
          **WILFREDO O. ALLEN**
          The Florida Bar No. 5557900

## CERTIFICATE OF SERVICE

I CERTIFY on June 1, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

By: _S/ Benedict P. Kuehne_
**BENEDICT P. KUEHNE**

43