# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 16-cv-21868-CV-GAYLES

**MOVIMIENTO DEMOCRACIA, INC.,**
*et al.*,

      Plaintiffs,

vs.

**JEH CHARLES JOHNSON**, Secretary,
Department of Homeland Security, *et al.*,

      Defendants.

_____/

## <u>ORDER</u>

The principal plaintiffs in this case are Cuban migrants who temporarily found sanctuary on the American Shoal Lighthouse off the coast of the Florida Keys on May 20 and 21, 2016. They seek declaratory and injunctive relief such that they be declared to have reached United States dry land, be brought to shore from their current location aboard a U.S. Coast Guard cutter,[1] and be allowed to seek relief as Cuban refugees pursuant to U.S. immigration law. The facts in the case are largely undisputed, so the paramount issue before the Court is whether reaching the American Shoal Lighthouse qualified the migrants for relief pursuant to the Cuban Adjustment Act and the Executive Branch's procedures implementing current American–Cuban immigration policy. Specifically, the Court must decide whether the Coast Guard properly determined that the migrants' situation was "wet foot" under Executive Branch policies and whether, apart from that administrative determination, the migrants qualify for any protections

---

[1] At the time of the hearing on June 2, 2016, the Cuban migrants were aboard a U.S. Coast Guard cutter. The Court requested that the Coast Guard maintain the migrants on the cutter until a decision issued in this case, and there has been no indication in the record that the Coast Guard has repatriated the migrants.

under the Constitution. In deciding this legal question, the Court is mindful of the proper role of federal courts in such matters. *See Gonzalez v. Reno*, 212 F.3d 1338, 1344 (11th Cir. 2000) ("*Gonzalez I*") ("[T]he case is mainly about the separation of powers under our constitutional system of government: a statute enacted by Congress, the permissible scope of executive discretion under that statute, and the limits of judicial review of the exercise of that executive discretion.").

The Court has considered Plaintiffs' Emergency Complaint [ECF No. 1], First Amended Complaint [ECF No. 16], Plaintiffs' Memorandum of Law and Fact in Support of Declaratory and Injunctive Relief [ECF No. 11], the parties' responses and replies thereto, the Administrative Record of the United States Coast Guard [ECF No. 12], all other filings, and the relevant law. The Court heard extensive argument from all parties on June 2, 2016, regarding Plaintiffs' motion for preliminary injunction. Since that hearing, the Court has received and reviewed additional filings. For the reasons that follow, Plaintiffs' motion for preliminary injunction is denied.

## I.      IMMIGRATION POLICY FOR CUBAN NATIONALS

### A.      The Cuban Adjustment Act

In response to the influx of refugees who were fleeing from Cuba in the early 1960s, Congress enacted the Cuban Adjustment Act of 1966 ("CAA"), Pub. L. No. 89-732, 80 Stat. 1161 (codified as amended at 8 U.S.C. § 1255 note). *See also* Note, *The Cuban Adjustment Act of 1966: ¿Mirando por los Ojos de Don Quijote o Sancho Panza?*, 114 Harv. L. Rev. 902, 908–11 (2001) (discussing "[f]our predominant reasons [that] motivated Congress to enact the CAA," including national security, humanitarian concerns, reducing administrative burdens, and streamlining Cuban refugees into the American labor market). The current version of the CAA

2

provides as follows:

> [T]he status of any alien who is a native or citizen of Cuba and who has
> been inspected and admitted or paroled into the United States subsequent
> to January 1, 1959 and has been physically present in the United States for
> at least one year, may be adjusted by the Attorney General, in his
> discretion and under such regulations as he may prescribe, to that of an
> alien lawfully admitted for permanent residence if the alien makes an
> application for such adjustment, and the alien is eligible to receive an
> immigrant visa and is admissible to the United States for permanent
> residence.

*Toro v. Sec'y, U.S. Dep't of Homeland Sec.*, 707 F.3d 1224, 1226 (11th Cir. 2013) (quoting CAA

§ 1). As the Eleventh Circuit has noted, current "immigration law and policy afford special

treatment to Cuban nationals who come to the United States. . . . Cuban nationals, who have no

documents authorizing their presence in the United States, can remain in the United States

without demonstrating that they suffered persecution or proving refugee status." *United States v.*

*Dominguez*, 661 F.3d 1051, 1067 (11th Cir. 2011).

### B.  The "Wet-Foot/Dry-Foot" Policy

The Eleventh Circuit explained the implementation of immigration law regarding Cuban

migrants as follows:

> The benefits of the CAA . . . can only apply to those Cubans who reach
> United States soil (those with "dry feet") while Cubans who are
> interdicted at sea (those with "wet feet") are repatriated to Cuba. This rule
> is commonly referred to as the "Wet-Foot/Dry-Foot" policy. . . . [T]he
> Wet-Foot/Dry-Foot policy applies to Cubans regardless of whether they
> entered the United States at a designated port-of-entry.

*Id.* at 1067–68 (citing Doris Meissner, Comm'r, INS, *Eligibility for Permanent Residence Under*

*the Cuban Adjustment Act Despite Having Arrived at a Place Other Than a Designated Port-of-*

*Entry* (Apr. 19, 1999), *reprinted in* 76 Interpreter Releases No. 17, at 676 app. 1 (May 3, 1999) ("Meissner Memorandum")). The Wet-Foot/Dry-Foot Policy refers to the agreement reached between the United States and Cuba regarding the "common interest in preventing unsafe departures from Cuba which risk loss of human life." Joint Statement on Normalization of Migration, Building on the Agreement of September 9, 1994, Cuba–U.S., 35 I.L.M. 327, 329 (May 2, 1995). Therefore, "Cuban migrants intercepted *at sea* by the United States and attempting to enter the United States will be taken to Cuba." *Id.* at 328. (emphasis added). There is no congressional guidance regarding what constitutes "wet foot" or "dry foot" status. However, the Department of Homeland Security ("DHS") has detailed its operational procedures for executing this Policy in the Coast Guard's Maritime Law Enforcement Manual, COMDTINST M16247.1F, as provided in redacted form in the administrative record. [ECF No. 12-1 at 29–32].

### C.    Coast Guard Policy

Federal law provides that the Secretary of Homeland Security "shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). The United States Coast Guard is a "service in the Department of Homeland Security." 14 U.S.C. § 3(a). Additionally, the Coast Guard establishes, maintains, and operates aids to maritime navigation. *Id.* § 81(1).

The legal framework for the Coast Guard's operations regarding the interdiction of vessels is that of the Immigration and Nationality Act of 1952 ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (current version codified as amended in scattered sections of 8 U.S.C.), and the President's "constitutional authority as commander-in-chief to ensure the security of U.S. borders (U.S. Constitution, Art. 1, Sec. 2, cl. 1)." [ECF No. 12-1 at 30]; *see also* 8 U.S.C.

§ 1185(a)(1) (providing that "it shall be unlawful for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe"). Specifically, President George H. W. Bush issued Executive Order 12,807, which authorized the Coast Guard to interdict migrants at sea and "return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws." Exec. Order No. 12,807 § 2(c)(3), 57 Fed. Reg. 23,133 (May 24, 1992), as amended by Exec. Order No. 13,286 § 30, 68 Fed. Reg. 10,619 (Feb. 28, 2003). Nevertheless, the Secretary of Homeland Security, "in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent." *Id.* Additionally, pursuant to President George W. Bush's Executive Order 13,276, the Secretary of Homeland Security "may maintain custody, at any location he deems appropriate, of any undocumented aliens he has reason to believe are seeking to enter the United States and who are interdicted or intercepted in the Caribbean region" and "may conduct any screening of such aliens that he deems appropriate, including screening to determine whether such aliens should be returned to their country of origin or transit, or whether they are persons in need of protection who should not be returned without their consent." Exec. Order No. 13,276 § 1(a), 67 Fed. Reg. 69,985 (Nov. 15, 2002), as amended by Exec. Order No. 13,286 § 1, 68 Fed. Reg. 10,619 (Feb. 28, 2003).

In 1993 and 1996, the Office of Legal Counsel ("OLC") of the Department of Justice issued legal opinions that are generally binding on all federal agencies in implementing immigration policy. *See Cherichel v. Holder*, 591 F.3d 1002, 1016 n.17 (8th Cir. 2010) (noting that "OLC opinions are generally binding on the Executive branch"). These opinions concluded

that undocumented aliens seeking to reach the United States, but who have not landed or been taken ashore on United States dry land, are not entitled to removal or other proceedings under the INA. *See* Immigration Consequences of Undocumented Aliens' Arrival in U.S. Territorial Waters, 17 Op. O.L.C. 77, 83 (1993); Procedural Rights of Undocumented Aliens Interdicted in U.S. Internal Waters, 20 Op. O.L.C. 381, 385 (1996). Specifically, the OLC interpreted 8 U.S.C. § 1225(a)(1) and concluded that an alien attains the status of an "applicant for admission" only when he or she "has reached or been brought to the United States *dry land*." Procedural Rights, 20 Op. O.L.C. at 385 (emphasis added) (citations and internal quotation marks omitted); *see also Rodriguez v. Ridge*, 310 F. Supp. 2d 1242, 1245 (S.D. Fla. 2004) (stating that mere entry into United States waters is insufficient to accord someone the status of "applicant for admission" under 8 U.S.C. § 1225(a)(1)).

Consistent with those two OLC opinions, the Coast Guard's procedures provide that "[i]nterdicted migrants who have not yet reached U.S. soil are normally returned to the country from which they departed" and that "migrants are not deemed to have entered the U.S. unless they are located on U.S. dry land." [ECF No. 12-1 at 32]. Article 8.D.1. of the Maritime Law Enforcement Manual provides as follows:

> Migrants interdicted in U.S. internal waters, U.S. territorial sea or onboard a vessel moored to a U.S. pier are not considered to have entered the U.S. Migrants located on pilings, low-tide elevations or *aids to navigation* are not considered to have come ashore in the U.S. Migrants who reach bridges, piers, or other structures currently and permanently *connected to dry land* have not, as a matter of law, reached dry land; however, they are generally treated as if they had reached dry land in order to have a workable, operational standard from a policy perspective.

[*Id.*] (emphasis added).

6

## II.    FACTUAL BACKGROUND

### A.    The Lighthouse

The American Shoal Lighthouse (the "Lighthouse") began operating on July 15, 1880. It is located over seven miles south of Sugarloaf Key, Florida, within the territorial sea of the United States. It stands 109 feet in height, with nine legs—drilled into the coral reef on the seabed and remaining submerged at all times—that support a prefabricated iron-and-wrought-iron permanent structure. The submerged land to which the Lighthouse is attached had been conveyed from the State of Florida to the United States prior to the Lighthouse's construction. The water beneath the Lighthouse is approximately four feet deep at its shallowest, and the closest dry land to the Lighthouse is Sugarloaf Key, over seven miles away.

The Lighthouse's 2600-square-foot dwelling space is comprised of eight rooms. When in operation, a keeper and two assistants lived on the Lighthouse, with room remaining for maintenance crews. Two 5000-gallon water tanks supplied water to the keeper, assistants, and crew. An inspector report for the Lighthouse from 1909 refers to the enclosed structure as an octagonal two-story dwelling. Report for American Shoal (Florida)—1909, U.S. Lighthouse Soc'y, http://uslhs.org/inventory/light_station_report.php?id=13 (last visited June 24, 2016).[2]

The Lighthouse remained actively used in some capacity by the United States until 2015—for over 135 years. While operating, its lens rotated to produce a flash to guide ships away from dangerous reefs. It was added to the U.S. National Register of Historical Places on January 25, 2011, and has been featured on a postage stamp by the U.S. Postal Service. The Lighthouse became automated in 1963 and continued as a navigation aid until 2015, when an automatic light was erected nearby. Between 1963 and its decommissioning in 2015, the

---

[2]   This report was admitted into evidence during the hearing on June 2, 2016.

Lighthouse remained unmanned except for a period of five months in 1980, when it served as a lookout tower for migrant vessels during the Mariel boatlift. While the Lighthouse remains U.S. Government property and a charted aid to navigation, it is no longer in use and is officially listed as abandoned, unstable, and unsafe in the Coast Guard's official *Light List*. [ECF No. 12-1 at 37].[3]

**B.    The Interdiction**

At approximately 12:44 p.m. on May 20, 2016, the Coast Guard received notification of a boat traveling south of Cudjoe Key, Florida. By 1:09 p.m., the Coast Guard spotted the vessel—a fifteen-foot, blue-and-yellow boat without registration. The occupants had thrown a tarp over the boat in an attempt to conceal themselves. [*Id.* at 5]. Despite the pursuit of the Coast Guard, the boat did not stop until 1:40 p.m., when it experienced engine trouble. Two of the occupants complied with the Coast Guard's orders to yield and were taken into custody. The remaining occupants, however, armed themselves with metal pipes, jumped into the ocean, and swam to the Lighthouse. [*Id.*]. By 1:55 p.m., the migrants had climbed onto the Lighthouse and, still armed and feeling threatened by the Coast Guard, refused to come down, having contacted both their families and the media. [*Id.*]. At 2:51 p.m., the Coast Guard's legal team concluded that presence on the Lighthouse was a "wet-foot situation due to location of the light" and that "the migrants need to be processed at sea." [*Id.*]; *see also infra* Section II.C. At approximately 9:20 p.m., after

---

[3]    The Coast Guard's Seventh District ("District 7"), which is comprised of areas including South Carolina to Florida; Puerto Rico; the U.S. Virgin Islands; and Guantanamo Bay, Cuba, actively maintains approximately 5205 man-made fixed aids to navigation, including lighthouses, lights, ranges, and day beacons. [ECF No. 12-1 at 50–51]. DHS defines an "aid to navigation" as "[a]ny device external to a vessel or aircraft specifically intended to assist navigators in determining their position or safe course, or to warn them of dangers or obstructions to navigation." U.S. Dep't of Homeland Sec., U.S. Coast Guard, *Light List, Volume III, Atlantic and Gulf Coasts*, at xvii (2016), *available at* http://www.navcen.uscg.gov/pdf/lightLists/LightList%20V3.pdf. A "lighthouse" is "[a] lighted beacon of major importance," *id.* at xviii, and a "beacon" is "[a] lighted or unlighted fixed aid to navigation attached directly to the earth's surface," *id.* at xvii. The American Shoal Lighthouse itself is listed as an abandoned aid to navigation. *Id.* at 11. (This page of the *Light List* appears in the administrative record. [ECF No. 12-1 at 37].) Moreover, all aid-to-navigation equipment has been removed from the Lighthouse, save eight solar panels.

hours of negotiating between government agents and the migrants, the migrants finally agreed to come down from the Lighthouse. At that time, twenty-one migrants had been interdicted: the two who surrendered from their boat and nineteen who descended from the Lighthouse.

At approximately 1:00 p.m. the following day, two more migrants were spotted on the Lighthouse. A third was discovered in the water clinging to a wooden board an hour and a half later. Those three migrants had been hiding in the Lighthouse when the others had departed with the Coast Guard the night before, and the migrant found in the water had jumped off some time afterwards. In total, the Coast Guard interdicted twenty-four Cuban nationals. Each migrant received a Manifestation of Fear Interview by the U.S. Citizenship and Immigration Service ("USCIS"), a component of DHS, on or before May 24, 2016. [ECF No. 12-1 at 48]. USCIS concluded that there were no protection concerns regarding fear of returning to Cuba and that all migrants could be returned to their home country.

### C.     Agency Action

District 7 of the Coast Guard determined that the Migrant Plaintiffs' presence on the Lighthouse was a "wet-foot situation" that required repatriation to Cuba. [*Id.* at 5]. Lieutenant Commander Travis Emge, U.S. Coast Guard, is a judge advocate at Coast Guard Headquarters in Washington, D.C. His office is the principal legal advisor to the Office of Maritime Law Enforcement ("CG-MLE") for migrant interdiction operations. [*Id.* at 47]. On May 24, 2016, he reviewed District 7's recommendation that the migrants be repatriated. Specifically, he reviewed Article 8.D.1. of the Maritime Law Enforcement Manual. After reviewing photos of the Lighthouse, Lieutenant Commander Emge concluded that repatriation was in accordance with national and Coast Guard policy. [*Id.*]. After CG-MLE received concurrence from the DHS's Refugee, Asylum, and International Operations Directorate and from USCIS, CG-MLE directed

District 7 to repatriate the twenty-four Cuban migrants. [*Id.*]; [*Id.* at 33–34, 48–49]. In sum, the Coast Guard and other segments of DHS together concurred in the interpretation of the Migrant Plaintiffs' status on the American Shoal Lighthouse and with the conclusion that the Migrant Plaintiffs should be repatriated to Cuba.

## III.    <u>JURISDICTION</u>

Before reaching the merits of the Plaintiffs' arguments, the Court must determine whether it has subject matter jurisdiction to preside over this case. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.").

This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiffs concede that this Court has jurisdiction to review their claim that they have been denied their constitutional due process and equal protection rights under the Fifth Amendment of the Constitution. This Court also has jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA").

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Specifically here, "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. *Id.* § 704. To be considered final, the agency action must "mark the 'consummation' of the agency's decisionmaking process" and must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v.*

10

*Spear*, 520 U.S. 154, 177-78 (1997) (quoting *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.").

Here, the Plaintiffs argue that "the Coast Guard actions at issue in this litigation are purely operational and enforcement matters that are not quasi-judicial" and do not, therefore, qualify as an agency adjudication. [ECF No. 11 at 15]. They further argue that "[t]his is not an administrative adjudication; this is a litigation position." [*Id.* at 21].

The Court is convinced, however, that this determination by the Coast Guard does qualify as an informal adjudication[4] because it determined the rights of the Plaintiffs after "receiving and weighing some evidence." *Gonzalez ex rel. Gonzalez v. Reno*, 215 F.3d 1243, 1245 (11th Cir. 2000) ("*Gonzalez II*"). The Coast Guard "acted in the context of an actual and concrete dispute with and before that agency," and its "decision was final and binding on Plaintiff[s] unless [they], in effect, appealed it to a court." *Id.*[5] "The APA specifically contemplates judicial review on the basis of the agency record compiled in the course of informal agency action in which a hearing has not occurred." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). The Court further finds no merit to Plaintiffs' argument that the Coast Guard's position in this case is merely a "litigating position." There is a record of the Coast Guard's reasoning in the informal adjudication of the Cuban migrants' rights. "There is, of course, nothing wrong with an agency

---

4   A formal adjudication is one "required by statute to be determined on the record after opportunity for an agency hearing." *See* 5 U.S.C. § 554(a). "[I]nformal adjudication occurs when an agency determines the rights or liabilities of a party in a proceeding to which [a formal adjudication under the APA] does not apply." *Ass'n of Nat. Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1161 n.17 (D.C. Cir. 1979).

5   The APA defines an "order" as "a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing" and an "adjudication" as the "agency process for the formulation of an order." 5 U.S.C. §§ 551(6)–(7).

compiling and organizing the complete administrative record after litigation has begun from all the files of agency staff involved in the agency action, as long as that record only contains documents considered by the staff prior to the agency action." *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1247 n.2 (11th Cir. 1996). Here, there does not appear to be anything in the administrative record to suggest that this is a post-hoc rationalization of the Coast Guard's decision to interdict and repatriate the Cuban migrants. Accordingly, the Court has subject matter jurisdiction to review this informal adjudication, a final agency action.

## IV.   THE PARTIES

### A.   The Migrant Plaintiffs

Six of the Cuban migrants intercepted by the Coast Guard are named Plaintiffs in this action: Liban Concepcion Lio, Alexeis Leyva, Michael Perez Perez, Yordanki Perez Varea, Alexander Vergara Lopez, and Jegnier Cespedes Almaguer. In the First Amended Complaint, they bring a class action on behalf of themselves and the other Cuban migrants who climbed onto the Lighthouse.[6] They are referred to collectively as the "Migrant Plaintiffs" throughout this Order.

### B.   The Other Plaintiffs

The remaining Plaintiffs are Walter Marrero Hernandez, a lawful permanent resident of the United States and father of Migrant Plaintiff Walter Marrero Velasquez; Martha Hernandez Rodriguez, a United States citizen and mother of Migrant Plaintiff Alexei Batista Hernandez; Liban Concepcion Cruz, a lawful permanent resident and uncle of Migrant Plaintiff Liban Concepcion Lio; Vilma Curbelo, a United States citizen and cousin of Migrant Plaintiff Nestor

---

[6]   Not including the two migrants who surrendered to the Coast Guard and never ascended the Lighthouse.

Jose Ramirez Infante; David Delgado, a lawful permanent resident and father of Migrant Plaintiff Alexander Delgado Lopez; Maria Elena Lopez Gonzalez, a lawful permanent resident and mother of Migrant Plaintiff Alexander Vergara Lopez; Vilma Georgina Jomarron Carralero, a lawful immigrant visitor and mother of Migrant Plaintiff Jose Yans Perez Jomarron; and Carlos Leyva, a lawful permanent resident and uncle of Migrant Plaintiff Alexei Leyva Cespedes. They shall be referred to collectively as the "Family Plaintiffs" throughout this Order.

The final Plaintiff, Movimiento Democracia, Inc. ("Movimiento Democracia"), is a non-profit corporation.

### C. The Defendants

The Defendants in this case are DHS Secretary Jeh C. Johnson; Secretary of State John F. Kerry; Loretta E. Lynch, the Attorney General of the United States; and Linda Swanica, District Director of the USCIS's Miami District Office. The Defendants are executive officials charged with administering federal immigration law and policy.

## V. STANDING

At the outset, the Defendants argue that the Family Plaintiffs and Movimiento Democracia lack standing to assert the third-party rights of the Migrant Plaintiffs. [ECF No. 8 at 1 n.1]. The Defendants do not challenge the standing of the Migrant Plaintiffs, and this Court agrees that the Migrant Plaintiffs have standing to proceed in this action.

"The test for Article III standing is by now well settled. 'First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1271 (11th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Second, the plaintiff must establish a causal connection

between its injury and the defendant's conduct." *Id.* (citing *Lujan*, 504 U.S. at 560). "Third, the plaintiff must show that it is likely—and not merely speculative—that a favorable decision by the court will redress the injury." *Id.* (citing *Lujan*, 504 U.S. at 561). As the party invoking federal jurisdiction, Plaintiffs have the burden of demonstrating that they have standing to sue. *Id.* (citing *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1286 (11th Cir. 2010)).

### A.   __Family Plaintiffs__

The basic purpose of the standing doctrine "is to ensure that the plaintiff has a sufficient personal stake in the outcome of a dispute to render judicial resolution of it appropriate." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 319 (4th Cir. 2002). "Nevertheless, a person who does not satisfy Article III's standing requirements may still proceed in federal court if he meets the criteria to serve as next friend of someone who does." *Hamdi v. Rumsfeld*, 294 F.3d 598, 603 (4th Cir. 2002). The Family Plaintiffs acknowledge that they do not satisfy the requirements on their own accord but argue that they have this "next friend standing" to assert the claims on behalf of their relatives, the Migrant Plaintiffs. [ECF No. 11 at 11]. "A 'next friend' does not himself become a party" to the cause of action "in which he participates, but simply pursues the cause on behalf of . . . the real party in interest." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990). While Congress has explicitly authorized next friends to file habeas petitions, *see* 28 U.S.C. § 2242, "next friend standing is *not* limited to habeas cases, but instead may be invoked if plaintiffs can sufficiently demonstrate its necessity." *Ali Jaber v. United States*, — F. Supp. 3d —, 2016 WL 706183, at *3 (D.D.C. Feb. 22, 2016) (emphasis in original) (citing *Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 516 (D. Neb. 2007) ("*Whitmore*'s next friend analysis . . . has been extended to general civil litigation . . . .")), *appeal filed*, No. 16-5093 (D.C. Cir. Apr. 27, 2016). The Supreme Court has explained the

prerequisites for next friend standing:

> First, a "next friend" must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action. Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a "next friend" must have some significant relationship with the real party in interest. The burden is on the "next friend" clearly to establish the propriety of his status and thereby justify the jurisdiction of the court.

*Whitmore*, 495 U.S. at 163 (internal citations omitted). Here, it is undisputed that the Migrant Plaintiffs lack access to the Court or the counsel representing them due to the fact that they presently remain incommunicado on the Coast Guard cutter without access to their counsel and their family members. [ECF No. 11 at 4]. Second, the Family Plaintiffs, as the parents and close relatives of the Migrant Plaintiffs, satisfy the "significant relationship" requirement. The Family Plaintiffs have filed affidavits and immigration documents seeking to demonstrate their dedication to the Migrant Plaintiffs and their best interests in the current litigation. *See* [ECF No. 15]. The Family Plaintiffs also assert that they made advanced arrangements with their relatives "to obtain assistance of American legal counsel for any matters associated with their entry to the United States." [ECF No. 11 at 4]. Accordingly, the Court is satisfied that the Family Plaintiffs have demonstrated next friend status in the current case.

### B.   **Movimiento Democracia**

It appears unlikely, however, that Movimiento Democracia has standing in this case. First, Movimiento Democracia lacks organizational standing. It has not sufficiently alleged that it has suffered an injury-in-fact. *See, e.g.*, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("An organization must allege more than a frustration of its purpose because

frustration of an organization's objectives is the type of abstract concern that does not import standing. . . . To allege an injury to its interest, an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services in order to establish injury in fact . . . when the defendant's conduct causes an inhibition of [the organization's] daily operations. . . . [Moreover,] use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." (citations and internal quotation marks omitted)). Likewise, it does not have the requisite "close relation" to the Migrant Plaintiffs. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) ("[T]his Court has held that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (citation and internal quotation marks omitted)); *see also U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990) ("This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party.").

Second, Movimiento Democracia lacks associational standing, which grants an association "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also Movimiento Democracia, Inc. v. Chertoff*, 417 F. Supp. 2d 1350, 1354 (S.D. Fla. 2006) (concluding that Movimiento Democracia lacked associational standing in a similar case because it could not show that its members would otherwise have standing to sue in the case).

And third, there is no indication that any relationship exists at all between Movimiento Democracia and the Migrant Plaintiffs, let alone the "significant relationship" required for next friend standing under *Whitmore*. However, because the Court has already found that the Migrant Plaintiffs have standing to seek the requested relief and the Family Plaintiffs have next friend standing on their behalf, the Court need not engage in an analysis to conclusively determine the standing of Movimiento Democracia at this time. *See Comfort v. Lynn Sch. Comm.*, 418 F.3d 1, 11 (1st Cir. 2005) ("So long as one plaintiff has standing to seek a particular form of global relief, the court need not address the standing of other plaintiffs seeking the same relief."), *abrogated on other grounds*, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701 (2007); *accord Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977). Furthermore, such a conclusion does not affect the Court's analysis on the merits of the Migrant Plaintiffs' emergency motion for a preliminary injunction in this case.

### C.   Zone of Interests

Because the Plaintiffs are suing under the APA, they "must satisfy not only Article III's standing requirements, but an additional test: The interest [they] assert[] must be 'arguably within the zone of interests to be protected or regulated by the statute' that [they] say[] was violated." *Match-E-Be-Nash-She-Wish Band of Pottwatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)). The Court here easily concludes that the interests the Plaintiffs' seek to protect fall within the zone of interests of the INA. *See Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. —, 2016 WL 3434401 (June 23, 2016) (per curiam). Through its passing of the CAA, Congress explicitly took an interest in the regulation of Cuban

17

migration to the United States. The Migrant Plaintiffs here, in seeking admission to the United States and seeking to invoke its benefits, clearly satisfy the zone-of-interests test.

## VI.   LEGAL STANDARD

"A preliminary injunction may be granted to a moving party who establishes '(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.'" *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). "A preliminary injunction is an extraordinary and drastic remedy that should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites." *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015) (quoting *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001) (per curiam)).

## VII.   ANALYSIS

The Court shall address both the APA review of the Coast Guard's determination and the Plaintiffs' alleged constitutional claims in turn.

### A.   APA Claims

Defendants argue that the only review by this Court available to Plaintiffs is under the APA. The relevant section provides that "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. The statute further authorizes the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.*

§ 706(2)(A). In undertaking this review, "the court shall review the whole record or those parts of it cited by a party." *Id.* § 706. This standard is "exceedingly deferential." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008).

Under the principles of separation of powers, federal courts are hesitant to disturb the actions of the political branches regarding the admission of foreigners. "Although the Constitution contains no direct mandate relating to immigration matters, the Supreme Court has long recognized that the political branches of the federal government have plenary authority to establish and implement substantive and procedural rules governing the admission of aliens to this country." *Jean v. Nelson*, 727 F.2d 957, 964 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985). Because "[t]he political branches of the federal government therefore possess concurrent authority over immigration matters[,] . . . the courts have repeatedly emphasized that the responsibility for regulating the admission of aliens resides in the first instance with Congress." *Id.* at 965. The Supreme Court has stated that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials 'exercise especially sensitive political functions that implicate questions of foreign relations.'" *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988)); *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (referring to "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations").

The Eleventh Circuit has stated that "the vague and sweeping language employed by Congress in [the INA] permits wide flexibility in decision-making on the part of the executive officials involved, and the courts are generally reluctant to interfere." *Jean*, 727 F.2d at 967. "Thus, as a result of the existence of inherent executive power over immigration and the broad

19

delegations of discretionary authority in the INA, the separation-of-powers doctrine places few restrictions on executive officials in dealing with aliens who come to this country in search of admission or asylum." *Id.*

### 1.    *Deference to Agency Decisions*

The courts in this circuit generally recognize three levels of deference to agency actions. The most deferential standard is generally referred to as "*Chevron* deference," named for the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984). Under that standard, the Court must first decide "whether Congress has directly spoken to the precise question at issue" because both the agency and the Court "must give effect to the unambiguously expressed intent of Congress" and "that is the end of the matter." *Id.* at 842–43. However, if "Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute." *Id.* at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* The Supreme Court has highlighted notice-and-comment rulemaking and formal adjudication as two procedures that typically merit *Chevron* deference. *See United States v. Mead Corp.*, 533 U.S. 218, 230 (2001). In this case, Plaintiffs and Defendants all appear to agree that *Chevron* deference does not apply.

The lowest level of deference is known as "*Skidmore* deference," named for the Supreme Court's decision in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). Under that standard, agency "interpretations contained in formats such as opinion letters are 'entitled to respect' . . . but only to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore*, 323 U.S. at 140). Plaintiffs urge the Court

to apply this lowest level of deference and, ultimately, interpret the instant case itself.

Between the *Chevron* and *Skidmore* standards, the Eleventh Circuit has applied a mid-level deference in cases involving informal adjudication and foreign policy implications. *See Gonzalez I*, 212 F.3d at 1351; *Gonzalez II*, 215 F.3d at 1245; *see also Cook v. Wiley*, 208 F.3d 1314, 1319 (11th Cir. 2000) (affording "some deference" to a Bureau of Prisons interpretation where the interpretation was "reasonable" even if it was different from the interpretation the court would reach if deciding the matter *de novo*). In *Gonzalez I*, the Eleventh Circuit emphasized that deference to agency action "becomes considerable" when considering foreign policy implications. 212 F.3d at 1351. Under this "*Gonzalez* deference," where the agency's policy at issue "comes within the range of reasonable choices," the court must apply the "well-established principles of judicial deference to executive agencies" and cannot change the "policy in this case just because it might be imperfect." *Id.* at 1351–53. It is especially the case that the court "cannot invalidate [a] policy . . . with international-relations implications . . . merely because [the judge] personally might have chosen another. *Id.* at 1353 (citing *Chevron*, 467 U.S. at 865; *Jaramillo v. INS*, 1 F.3d 1149, 1153 (11th Cir. 1993)).

## 2. *Reasonableness of Agency Decisions*

First, before the Court cedes any deference to an agency's decision, that decision must be reasonable. *Cook*, 208 F.3d at 1319. An agency's decision is reasonable "so long as 'it is not arbitrary, capricious, or clearly contrary to law.'" *Id.* (quoting *U.S. Mosaic Tile Co. v. NLRB*, 935 F.2d 1249, 1255 (11th Cir. 1991)). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this "narrow" standard of review, "a court is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citations and internal quotation marks omitted). "Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the *least* latitude in finding grounds for reversal." *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (emphasis in original) (quoting *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541–42 (11th Cir. 1996)). If the agency's action is reasonable, the Court must then apply the appropriate level of deference.

### 3.    *Application to the Facts Here*

Here, Plaintiffs argue that the Coast Guard "incorrectly treated the American Shoal Lighthouse as merely a 'navigational aid' and not an existing structure permanently affixed to United States soil in United States territory." [ECF No. 11 at 6]. Plaintiffs ask the Court to find that the Lighthouse qualifies as dry land under the Wet-Foot/Dry-Foot Policy. Plaintiffs argue that the fact that the Migrant Plaintiffs "were standing with dry feet on a dry federal building on federal land during the course of their encounter with the Coast Guard, it is unreasonable to treat them as being interdicted on the high seas." [*Id.* at 30]. But because the Court concludes that the Coast Guard's decision here—an informal adjudication with foreign policy implications—is clearly entitled to *Gonzalez* deference, and because the Court cannot find that the Coast Guard acted unreasonably in concluding that the Lighthouse was a "navigational aid" that did not qualify as a dry foot situation, the Court defers to the Executive Branch's decision.

There is nothing unreasonable about the Coast Guard's determination that the

Lighthouse, as an aid to navigation, did not constitute dry land of the United States. Rather, such a conclusion is completely consistent with the aforementioned executive policies and procedures. Congress has not defined what constitutes the parameters of the Wet-Foot/Dry-Foot Policy. Rather, the Executive Branch has made that determination. Here, the Coast Guard has been charged with implementing the President's Executive Orders regarding the interdiction of vessels approaching the United States. "Under normal circumstances, an agency's interpretation of its own regulation is entitled to great deference," particularly in "a case in which the Secretary has made a written interpretation of the regulation or has maintained a longstanding policy on the subject." *McKee v. Sullivan*, 903 F.2d 1436, 1438 n.3 (11th Cir. 1990). Because the Court finds the Coast Guard's decision is reasonable, it is obligated to defer, to some extent, to the agency's interpretation of the applicable executive policies. *See Kester v. Campbell*, 652 F.2d 13, 15 (9th Cir. 1981) ("In light of an agency's presumed expertise in interpreting executive orders charged to its administration, we review such agency interpretations with great deference."); *accord Alaniz v. Office of Pers. Mgmt.*, 728 F.2d 1460, 1465 (Fed. Cir. 1984) (noting that "an agency's interpretation of an Executive order is entitled to great deference").

Plaintiffs' argument that the Lighthouse should be considered dry land because it is a dwelling on U.S. government property is similarly unavailing. No one has resided in the Lighthouse since at least 1963. As an abandoned—and dangerous—structure over seven miles from the closest dry land, no one today would live on the Lighthouse. [7] It has never been connected to dry land, and even at the lowest tide the water is still at least four feet deep. Because the Migrant Plaintiffs here would necessarily require transportation from the Lighthouse

---

[7]  Plaintiffs also urge this Court to consider the historical nature of the Lighthouse in its calculus, arguing that it "is now a storied part of Florida and United States history, an essential ingredient of commerce within the United States." [ECF No. 11 at 38]. While the Lighthouse's 135-year history may be fascinating for scholars, its historical significance is irrelevant to this Court's interpretation of the INA to the Migrant Plaintiffs' situation.

to the mainland in order to survive, landing on the Lighthouse is essentially no different than having been interdicted at sea. *Cf. Zhang v. Slattery*, 55 F.3d 732, 754 (2d Cir. 1995) ("United States immigration law is designed to regulate the travel of human beings, whose habitat is land, not the comings and goings of fish or birds."); *see also Matter of Lewiston-Queenston Bridge*, 17 I. & N. Dec. 410, 413 (BIA 1980) ("[W]hen an individual comes to this country by way of an international bridge, he has 'landed' when he touches United States soil.").[8] Further, the Court finds it troubling that the Migrant Plaintiffs only reached the Lighthouse after arming themselves with metal pipes and disobeying Coast Guard orders by swimming away.

Applying the Eleventh Circuit's "*Gonzalez* deference," the Court cannot overturn the Coast Guard's reasonable conclusion that the Cuban migrants did not reach "dry land." The Coast Guard's informal adjudication here implementing Executive Branch policy falls "within the range of reasonable choices," and this Court is not authorized to replace that determination because it "might be imperfect" or because the Court "might have chosen another." *See Gonzalez I*, 212 F.3d at 1351–53.

Plaintiffs seek a bright-line rule from this Court that arrival on a federal structure—even one more than seven miles from dry land—renders one an "applicant for admission" pursuant to the INA based on having arrived on U.S. property and thereby being "present in the United States." *See* 8 U.S.C. § 1225(a)(1). Such an interpretation lacks any foundation in current immigration law, and such a ruling by this Court would itself be arbitrary and capricious. Congress has not explicitly defined the term "present," so the intent of Congress must be ascertained by looking at other provisions of the INA, and the agency is authorized by law to fill

---

[8]   Entry into the United States, therefore, "can be satisfied only when an alien reaches dry land." *Yang v. Maugans*, 68 F.3d 1540, 1549 (3d Cir. 1995); *see also Zhang*, 55 F.3d at 755 ("Zhang was not physically present until he arrived on the beach."); *see also Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1343 (4th Cir. 1995) (concluding that "Chen never officially entered the United States" because he was apprehended "before he reached the shore").

in statutory gaps. *Gonzalez I*, 212 F.3d at 1348–49 ("As a matter of law, it is not for the courts, but for the executive agency charged with enforcing the statute . . . to choose how to fill such gaps.").

There already exists a bright-line rule, which has been in place for over ten years under both the INA and the Executive Branch's authority over border security: that aliens must reach dry land of the United States in order to be considered applicants for admission. The INA defines "United States" as "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands." 8 U.S.C. § 1101(38). The Coast Guard's Maritime Law Enforcement Manual provides that "in order to have a workable, operational standard from a policy perspective," migrants who reach "bridges, piers, or other structures currently and permanently connected to dry land" are treated "as if they had reached dry land" even though they "have not, as a matter of law, reached dry land." [ECF No. 12-1 at 32].

Plaintiffs rely heavily on the case of *Movimiento Democracia, Inc. v. Chertoff*, 417 F. Supp. 2d 1343 (S.D. Fla. 2006), *vacated*, Order Approving Stipulation of Settlement and Dismissal and Vacating Court's Order Denying Defendants' Motion for Summary Judgment at 2, No. 06-20044 (S.D. Fla. Mar. 15, 2006), ECF No. 26. In that case, fifteen Cuban migrants landed on an abandoned section of the old Seven Mile Bridge in the Florida Keys. *Id.* at 1345. The Coast Guard determined that landing on the bridge did not qualify the migrants for relief under the INA and repatriated them to Cuba. *Id.* at 1345. However, the district court concluded that the Coast Guard's determination was unreasonable and not entitled to deference, as the Coast Guard's own website stated, "If [migrants] touch U.S. soil, bridges, piers, or rocks, they are subject to U.S. Immigration processes for removal." *Id.* at 1349 (alteration in original).

25

Unlike that case, reaching the Lighthouse here does not fall within the Coast Guard's own policy. [9]

Here, arrival on "pilings, low-tide elevations or aids to navigation" is not considered arrival on dry land. [ECF No. 12-1 at 32]. Accordingly, this bright-line rule has been provided by the "political branches of the federal government" with "plenary authority to establish and implement substantive and procedural rules governing the admission of aliens to this country," and it does not now fall upon this Court to disturb that policy. *See Jean*, 727 F.2d at 964–95. The Migrant Plaintiffs in this case ascended the Lighthouse more than seven miles from dry land, and the Coast Guard determined under current immigration law and Executive Branch policy that such a landing was not upon United States dry land. Under deferential APA review, this Court cannot "set aside agency action" here because the Coast Guard's conclusion regarding the Migrant Plaintiffs on the Lighthouse was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

### B.   Constitutional Claims

Plaintiffs argue that they have been denied their constitutional due process and equal protection rights based on the government's failure to process them as refugees under the CAA. In particular, they argue that landing on the American Shoal Lighthouse qualifies them as "dry foot" arrivals in the United States for purposes of their admission to the United States. [ECF No. 19 at 1]. [10] Plaintiffs contend that "[t]he Coast Guard's apparent conclusion that the United States

---

[9]   This case presents the "slippery slope" noted by Judge Moreno in his well-reasoned Order on which Plaintiffs rest much of their argument. *See Movimiento Democracia*, 417 F. Supp. 2d at 1348.

[10]   To the extent that Plaintiffs bring a claim for "injury by prolonging family separation," [ECF No. 1 at ¶ 47] & [ECF No. 16-1 ¶ 54], this claim fails as a matter of law. *See, e.g., Kerry v. Din*, 135 S. Ct. 2128, 2131 (2015) (stating that there is no constitutional right to live in the United States with one's unadmitted nonresident alien spouse); *see also Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1513 (11th Cir. 1992) (stating that "associational freedom in no way implies a right to compel the Government to provide access to those with whom one wishes to associate") (citing *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 & 15 (1978)).

Constitution does not exist on this federal building under federal jurisdiction nonetheless fails because the Due Process Clause reaches all persons within the United States." [ECF No. 11 at 23]. They further contend that the current American–Cuban immigration policy entitles them to special consideration under the INA because of their status as Cuban nationals.[11]

The Supreme Court "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (citations omitted). While it is true that "once an alien gains admission to our country

---

[11] Plaintiffs' position is that under the Wet-Foot/Dry-Foot Policy, "arriving Cubans are treated as a special class of immigrant, allowing a different immigration status to Cubans who come to the United States at other than a normal port of entry" and that "Cubans who arrive at places other than designated ports of entry are admitted to the United States." [ECF No. 19 at 5]. Specifically, Plaintiffs argue that because they "landed at a recognized lighthouse built by the United States and utilized as an official building of the United States for official business and occupancy, [they] arrived in the United States at a place other than a designated port of entry, consistent with the operation of the CAA and the 'Wet Foot/Dry Foot' policy." [*Id.* at 5–6]. The Meissner Memorandum called for the Cuban Adjustment Act to "be construed generously, in order to give full effect to the purpose of the CAA." Meissner Memorandum, *supra*. Plaintiffs argue that Defendants have acted contrary to that requirement to be "generous" in application of the CAA to their situation. [ECF No. 19 at 6].

While it is true that Cuban nationals become eligible to apply for parole and eventually seek adjustment of status to lawful permanent residents pursuant to the CAA, none of these immigration benefits are guaranteed or automatic. "Although the [CAA] granted Cuban refugees additional rights, it does not extend so far as to automatically adjust the status of all Cubans in the United States. Instead, it provides a discretionary tool for the Attorney General to adjust the status of Cubans who had been paroled into the United States to that of lawful permanent residents." *Avila-Sanabria v. Lapin*, 234 F.3d 1272 (7th Cir. 2000) (citing Pub. L. No. 89-732, 80 Stat. 1161 (Nov. 2, 1966) (reproduced as a historical note to 8 U.S.C. § 1255)). While the CAA "allow[s] for certain rights for Cubans who reach the United States," it does "not address the rights of Cuban migrants to enter or to seek entry to the United States initially, nor do[es] [it] confer directly any rights upon the Cuban migrants outside the United States." *Cuban Am. Bar Ass'n, Inc. v. Christopher*, 43 F.3d 1412, 1426 (11th Cir. 1995); *see also id.* at 1428 ("Our decision that the Cuban . . . migrants have no First Amendment or Fifth Amendment rights which they can assert is supported by the Supreme Court's decisions declining to apply extraterritorially the Fourth Amendment or the Fifth Amendment. Clearly, aliens who are outside the United States cannot claim rights to enter or be paroled into the United States based on the Constitution." (citations omitted)). "Because Congress possesses plenary power over immigration and aliens have no constitutional right to enter or remain in the United States, an entitlement to an immigration benefit must be conferred by statute." *Ibarra v. Swacina*, No. 09-22354-CIV, 2009 WL 4506544, at *5 (S.D. Fla. Dec. 3, 2009), *aff'd*, 628 F.3d 1269 (11th Cir. 2010) (per curiam). "Congress did not create a statutory entitlement to adjustment of status when it enacted . . . the Cuban Adjustment Act." *Id.*

Additionally, the grant of parole into the United States affords no entitlement to immigration status. "The Attorney General may . . . in his *discretion* parole into the United States temporarily . . . any alien applying for admission to the United States, but such parole of such alien *shall not be regarded as an admission of the alien*." 8 U.S.C. § 1182(d)(5)(A) (emphasis added). Parole is "a temporary, unofficial entry into the United States." *Benitez v. Wallis*, 337 F.3d 1289, 1296 (11th Cir. 2003), *rev'd on other grounds sub nom. Clark v. Martinez*, 543 U.S. 371 (2005).

and begins to develop the ties that go with permanent residence his constitutional status changes accordingly," *id.* (citing *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950)), "an alien on the threshold of initial entry stands on a different footing," *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953), and is not afforded such constitutional rights regarding the immigration process.[12] Rather, the Supreme Court has stated "that an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such privilege is granted to an alien only upon such terms as the United States shall prescribe. It must be exercised in accordance with the procedure which the United States provides." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) (citations omitted). "The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *Id.* (citations omitted). "Normally Congress supplies the conditions of the privilege of entry into the United States. But because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power . . . ." *Id.* at 543. The Supreme Court's strongest caution against judicial interference reads as follows:

> It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and

---

[12] "There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law. Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (citations omitted). Migrant Plaintiffs in this case, however, have not been "present in this country" pursuant to the INA and, consequently, the Constitution.

lawful measures of the legislative and executive branches of the national government. As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law.

*Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892) (citations omitted).

Plaintiffs have indicated no provision in the INA that requires the Executive Branch to hold a hearing to determine if an alien is an applicant for admission under 8 U.S.C. § 1225(a)(1). Indeed, "the INA does not extend its protection to aliens who have never entered the United States." *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1508 (11th Cir. 1992). Aliens interdicted on the high seas do not have viable claims under the INA, the United States Constitution, presidential executive orders, or immigration agency guidelines. *See id.* at 1505–1515.[13]

Plaintiffs argue that "no agency can dictate to a federal court concerning what constitutes the United States for constitutional purposes." [ECF No. 11 at 24]. While that claim may be true in the abstract, this case does not present that controversy, as it is the INA that dictates to this Court what constitutes the "United States." "It is the province of the judiciary to say what the law *is*, or what it *was*. The legislature can only say what it *shall be*." *Fletcher v. Peck*, 10 U.S. 87, 123 (1810) (emphasis in original).

The previous federal definition of "United States" for immigration purposes before passage of the INA was found in section one of the Immigration Act of 1917. That section provided that the "term 'United States' shall be construed to mean the United States, and any *waters*, territory, or other place subject to the jurisdiction thereof." *United States v. Maisel*, 183

---

[13]   Plaintiffs also argue that they are entitled to due process protections of the APA under 5 U.S.C. § 555. However, that section of the APA is inapplicable to this case. *Cf. Marcello v. Bonds*, 349 U.S. 302, 307–310 (1955) (concluding that the "specialized administrative procedure" established by Congress for deportation proceedings departed from and superseded the general hearing procedure framework of the APA).

F.2d 724, 726 (3d Cir. 1950) (emphasis added) (quoting 8 U.S.C. § 173 (repealed)). "United States" in the current INA "means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, the Virgin Islands of the United States, and the Commonwealth of the Northern Mariana Islands." 8 U.S.C. § 1101(38). "Significantly, the current version does not include waters . . . subject to the jurisdiction of the United States. Nor can it be said that the current definition implicitly includes territorial waters. As the language . . . suggests, the INA provides expressly to the contrary." *Yang v. Maugans*, 68 F.3d 1540, 1548 (3d Cir. 1995). The INA, first enacted in 1952, unequivocally removed United States "waters" from the 1917 definition of "United States." Such removal demonstrates Congress's intent that entry on land is required for entry into the United States.[14] *See Simmons v. Himmelreich*, 578 U.S. —, 2016 WL 3128838, at *5 (June 6, 2016) ("Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says."); *see also United States v. Holmes*, 727 F.3d 1230, 1244 (10th Cir. 2013) (noting that Congress's decision not to draft a provision "does not appear accidental, and we must honor Congress's choice").

Plaintiffs rely on the definition of "United States" in Title 43 to support their argument that the Migrant Plaintiffs landed within the United States for constitutional purposes. Title 43 provides that "the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition." 43 U.S.C. § 1332(1). Plaintiffs urge the Court to conclude that the Lighthouse, as a federal building on federal land, is subject to the Constitution and federal law. [ECF No. 11 at 28]. In particular, Plaintiffs cite to

---

[14]  Notably, the section of Title 8 regarding travel of citizens and aliens diverges from the general INA definition of "United States" used in the rest of Title 8 pursuant to 8 U.S.C. § 1101(38). Instead, that section provides that the "term 'United States' as used in this section includes the Canal Zone, and *all territory and waters, continental or insular, subject to the jurisdiction of the United States*." 8 U.S.C. § 1185(c) (emphasis added). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) (citations omitted).

this provision from the Outer Continental Shelf Lands Act:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon *for the purpose of exploring for, developing, or producing resources therefrom*, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State.

43 U.S.C. § 1333(a)(1) (emphasis added). First, it is important to note that this provision explicitly limits its reach to artificial islands and installations erected "for the purpose of exploring for, developing, or producing resources." There is no evidence that the Lighthouse here would fall within that category. Second, as discussed above, an alien "on the threshold of initial entry stands on a different footing." *Mezei*, 345 U.S. at 212. The sole definition of "United States" that controls this case and the rights of the Migrant Plaintiffs is the one used in Title 8 for immigration purposes. Other definitions used elsewhere in the United States Code are not applicable in the present case. For example, the term "United States" is defined in Title 18 for criminal matters to "include[] *all places and waters, continental or insular*, subject to the jurisdiction of the United States, except the Canal Zone." 18 U.S.C. § 5 (emphasis added). As this case involves immigration law, the criminal jurisdiction statute does not apply. *See Rodriguez*, 310 F. Supp. 2d at 1246 (stating that reliance on criminal statute jurisdiction is not relevant for deciding jurisdiction in the immigration context).

Here, the Migrant Plaintiffs were not "present" within the United States pursuant to immigration law. Accordingly, their claim that they were applicants for admission under the INA fails. See 8 U.S.C. § 1225(a)(1) ("An alien present in the United States who has not been

admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."). Therefore, as new arrivals seeking entry into the United States, the Migrant Plaintiffs have no constitutional rights to assert. *See Landon*, 459 U.S. at 32.

The Migrant Plaintiffs also urge the Court to "conclude that [they], whether admitted or not, had the constitutionally respected right to apply for asylum because they were present in the United States" and that "a summary repatriation constitutes an egregious violation of Due Process." [ECF No. 11 at 26]. The INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). "There is no constitutional right to asylum per se. An alien seeking admission to the United States through asylum requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Chehazeh v. Att'y Gen.*, 666 F.3d 118, 145 (3d Cir. 2012) (citations and internal quotation marks omitted). "Despite the fact that there is no constitutional right to asylum, aliens *in the United States* have a due process right to a fair immigration hearing." *Precaj v. Holder*, 491 F. App'x 663, 668 (6th Cir. 2012) (emphasis added) (citing *Bridges v. Wixon*, 326 U.S. 135, 160 (1945)). The Migrant Plaintiffs here were not within the United States under the INA, however, so the process they received with regard to their request for asylum was sufficient due process. *See Nishimura Ekiu*, 142 U.S. at 660.

Additionally, the record is clear that all twenty-four occupants of the migrants' vessel were independently screened for asylum in compliance with DHS policy implementing Executive Order 12,807. This policy is articulated in the Coast Guard's Maritime Law

Enforcement Manual: "[T]he U.S. Government affords migrants with an opportunity to seek and receive protection from persecution or torture." [ECF No. 12-1 at 31]. Following individualized interviews with each Migrant Plaintiff here, DHS determined that none were eligible for its discretionary refugee status under Executive Order 12,807. "While resident aliens, regardless of their legal status, are entitled to at least limited due process rights, aliens 'who have never been naturalized, nor acquired any domicile of residence within the United States, nor even been admitted into the country pursuant to law' stand in a very different posture: 'As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by [C]ongress, are due process of law.'" *Jean*, 727 F.2d at 968 (quoting *Nishimura Ekiu*, 142 U.S. at 660). The record is replete with evidence that DHS has more than adequately complied with its expressly conferred powers in this case.

*   *   *

Finally, the Court wishes to highlight that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Plaintiffs in this case, through the zealous advocacy of their counsel, have been afforded ample opportunity to present their claims. This Court has independently reviewed the Coast Guard's agency adjudication as well as Plaintiffs' separate constitutional claims and has provided careful analysis of the positions argued. Markedly, the Coast Guard has not repatriated the Migrant Plaintiffs during the duration of the Court's review, in deference to the legal process. The Court is satisfied that Plaintiffs have received more than adequate consideration of their claims under even the broadest understanding of due process here.

## VIII.   <u>CONCLUSION</u>

"We acknowledge, as a widely-accepted truth, that Cuba does violate human rights and fundamental freedoms and does not guarantee the rule of law to people living in Cuba." *Gonzalez I*, 212 F.3d at 1353. "The principal human rights abuses include[] the abridgement of the ability of citizens to choose their government; the use of government threats, physical assault, intimidation, and violent government-organized counterprotests against peaceful dissent; and harassment and detentions to prevent free expression and peaceful assembly." Bureau of Democracy, Human Rights & Labor, U.S. Dep't of State, Cuba 2015 Human Rights Report 1, available at http://www.state.gov/documents/organization/253217.pdf. Twenty-four Cuban migrants boarded a boat slightly over a month ago in hopes of reaching the United States, the land of freedom and opportunity where their families and friends had ventured before them, a place where "all men are created equal" and where the "certain unalienable rights" of "Life, Liberty, and the pursuit of Happiness" are held sacred. The Declaration of Independence para. 2 (1776). There is no doubt that these Cuban migrants and their families have spent the pendency of this litigation dreaming of those opportunities in the spirit of the Cuban hero and poet José Martí: "I dream with open eyes both night and day; I always dream."[15]

The Court neither approves nor disapproves the Executive Branch's decision that the Cuban migrants in this case do not qualify for refugee processing as dry foot arrivals to the United States. Developments and revisions of immigration and foreign policy are left to the political branches of the government. However, the Coast Guard's informal adjudication in this case does not contradict Congress's policies in the INA nor the President's executive actions in

---

[15] "Yo sueño con los ojos abiertos, y de día y noche siempre sueño." *Twentieth-Century Latin American Poetry: A Bilingual Anthology* 21 (Stephen Tapscott ed., Elinor Randall trans., Univ. of Tex. Press 1996) (capitalization modified).

securing our borders. And Plaintiffs have not been deprived of any constitutional rights to which they are presently entitled.

*     *     *

The Court finds that Plaintiffs have not established a substantial likelihood of success on the merits. As a result, the Court need not analyze the remaining requirements for issuing a preliminary injunction. Accordingly, it is

**ORDERED AND ADJUDGED** that Plaintiffs' motion for preliminary injunction is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 28th day of June, 2016.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

cc:   Magistrate Judge Turnoff
      All Counsel of Record